**George BAKER, on behalf of himself and all others similarly situated; Ray Fredericks**

v.

**BALTIMORE COUNTY, MARYLAND, a body corporate and a body politic.**

Civ. No. K–76–1016.

United States District Court, D. Maryland.

March 26, 1980.

David S. Harris, Baltimore, Md., for plaintiffs.

Leonard S. Jacobson, County Sol. for Baltimore County, and John A. Austin, Asst. County Sol. for Baltimore County, Towson, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

In this class action plaintiffs, present or former Baltimore County police officers, seek injunctive and declaratory relief[1] from the continuing enforcement of Bill No. 138, which was enacted in 1959 by the County Council of Baltimore County and which is now codified as Title 20, Article II of the Baltimore County Code, 1968 Edition. Plaintiffs became members of the Police Department of Baltimore County on October 12, 1959. On October 15, 1959, the County Council passed Bill No. 138 amending the retirement plan applicable to County policemen. That ordinance was by its terms made retroactive to October 1, 1959, and thus altered the retirement plan applicable to plaintiffs, all of whom had entered into service on October 12, 1959. Plaintiffs contend that, by the passage of Bill No. 138, the County impaired the obligation of its contract with plaintiffs in violation of the Contract Clause of the United States Constitution.

Plaintiffs sue as individuals and as class representatives. Two classes have been certified pursuant to Federal Civil Rule 23(b)(2)[2]: 1) all police officers who became permanent[3] employees of the Baltimore County Police Department on October 12, 1959 and who are presently on active status, and 2) all police officers who became permanent employees of the Baltimore County Police Department on October 12, 1959, and who have been placed on early retirement because of medical disability.[4]

The County has filed a motion to dismiss the within complaint. However, because the record contains affidavits and stipulations, in addition to pleadings, that motion, pursuant to Federal Civil Rules 12 and 56, is treated herein as a motion for summary judgment. The material and relevant facts, which are not in dispute, are as follows:

1. No damages are sought herein.

2. See n. 1 supra.

3. The parties do not agree that all of the class members were on permanent as opposed to probationary status on October 12, 1959 when they were enrolled as police department employees. However, herein it is assumed, in the context of the County's motion for summary judgment, that, as plaintiffs contend, all of them became permanent employees (or had the same pension rights as permanent employees) as of the moment they became employees of the police department on October 12, 1959.

4. The parties have suggested the need for additional classes or subclasses. However, only one plaintiff class (rather than two) is needed since if plaintiffs were entitled to prevail herein, this Court could order all plaintiffs, who so desired, to be paid benefits, etc., as if they had been enrolled in the Policemen's Special Fund ("PSF") when they were hired on October 12, 1959, and as if they had remained so enrolled thereafter during their employment by the police department. Thus, relief could be flexibly made available to all members of the two classes. That is also true even if only one class had been created. Thus, no additional classes or subclasses would be needed to effectuate relief.

The question remains as to whether each and every member of the two plaintiff classes is affected exactly in the same way by coverage under one pension plan as opposed to the other. The answer is in the negative. It is seemingly for that type of reason that several members of the two plaintiff classes have indicated that they desire to "opt out" of their class. "Opting out," as such, is not possible from a (b)(2) class. However, in effect, such would-be "opt-outers" could have their choice, if plaintiffs were entitled to prevail herein, of remaining in the Employees' Retirement System of Baltimore County ("ERS") instead of being transferred to the PSF. Similarly, those members of the classes who have not attempted to "opt-out" and who would be disadvantaged by ERS as opposed to PSF coverage might be given their choice if plaintiffs were entitled to prevail herein.

*Facts*

1.  All of the members of the two plaintiff classes in this case became employees of the Baltimore County Police Department on October 12, 1959.

2.  Bill No. 138 was passed by the County Council of Baltimore County on October 8, 1959, was presented to the County Executive on October 9, 1959, and is assumed, for purposes of this opinion, to have become effective on October 15, 1959.[5]

3.  Prior to the enactment of Bill No. 138, policemen had been members of the PSF.[6] All who had been policemen prior to October 1, 1959 were given by Bill No. 138 the option of choosing coverage under either the PSF or a new fund established by that Bill, namely, the ERS. All policemen hired on or after October 1, 1959 were required by Bill No. 138 to enroll in the ERS.

4.  The two retirement plans, PSF and ERS, differ in several respects, including, *inter alia*, the following:

a.  The PSF is unfunded. The ERS is funded.

b.  The PSF is supported by employee contributions and by subsidy from the General Fund of Baltimore County. All of its funds are paid out at the end of each fiscal year. The maximum contribution by a policeman is 3% of his salary.[7] The ERS is supported by employee contributions which range from 4½% to 5½% of the salary of members. The exact amount which each individual employee is required to contribute is actuarially determined. Since the ERS is funded, it does not expend its entire resources at the end of each fiscal year.

c.  Under the PSF, if an employee retires before he has completed 10 years of active service, his contribution to the PSF is not refunded to him. That is because the PSF is unfunded, and thus consumes all of its assets at the end of each fiscal year. Under the ERS, an employee who withdraws from County employment prior to becoming eligible for retirement benefits receives a refund consisting of the total amount of his contributions plus interest.

d.  A policeman covered by the PSF may retire after 20 years of active service with the County on 50% of the salary of an active member of the rank at which that employee retired. Under the ERS, a member may retire at age 60, or after 30 years of service, whichever happens first, on a pension to be calculated under a formula set forth in the ordinance. A member of the ERS who retires early receives a pension consisting of the actuarial equivalent of the contributions he has made to the retirement system, or may defer his pension until he is 60.

e.  Under the PSF, the monthly retirement benefits for a typical patrolman retiring on January 1, 1980 in a non-disability status, who is not entitled to receive any credit for military service, who has been a

---

5.  The parties disagree as to the effective date of Bill No. 138. Plaintiffs contend that the effective date was October 15, 1959; defendant contends that the effective date was on or before October 8, 1959. Those disagreements which relate to County procedural requirements regarding the enactment of County legislation, *see* n. 12 *infra*, raise legal and factual issues which if determined adversely to plaintiffs would completely destroy plaintiffs' contentions herein of violation by the County on October 15, 1959 of plaintiffs' constitutional contract rights which came into existence on October 12, 1959 when plaintiffs joined the police department. That is so because if the legislative change became effective on October 8, 1959, it occurred before plaintiffs' alleged contract rights came into being on October 12, 1959. Herein, in the context of the County's summary judgment motion, it is assumed that

the effective date was October 15, 1959, and that the changes made in the retirement plan by Bill No. 138 were retroactively applied to plaintiffs, all of whom were hired on October 12, 1959. All of the changes made by Bill No. 138 related to payments to be made into the retirement plan in the future and to the date in the future at which the members might retire.

6.  *See* Title 21, Article III and Title 41, Article II of the Baltimore County Code, 1958 Edition, now Title 20, Article III, Division 2 of the Baltimore County Code, 1968 Edition.

7.  The ordinance indicates that the maximum contribution under the PSF is 4% of salary, but the parties appear to agree that the maximum is 3%. Accordingly, it is assumed herein that the maximum contribution under the PSF is 3%.

policeman continuously since October 1, 1959, who elected the option that would pay the maximum monthly benefit to the retiree, and who was at least 50 years of age upon retirement, would be $723.96 per month. Under the ERS, the same retiree would receive $548.32 per month.

f. A PSF member retired because of a medical disability received in the line of duty may receive no more than 50% of the salary of an active officer of like rank. An ERS member may receive as much as 66⅔% of his average annual compensation (not tied to active salary) plus an annuity tied to the sum of his contributions.

5. None of the members of either plaintiff subclass has ever been enrolled in the PSF. When plaintiffs became full-time employees on October 12, 1959, they were enrolled in the ERS.

6. While all of the members of the two plaintiff classes knew that the retirement plan in which they were being enrolled was not the PSF, and that it differed from the PSF, plaintiffs state—and in the present summary judgment context of this case, it is assumed—that they did not know what the precise differences were.[8] Most or all plaintiffs were sent a letter dated September 29, 1959 indicating that changes in the retirement plan were contemplated. Further, most or all plaintiffs, when hired, filled out a Designation of Beneficiary form which on its face indicated that the person filling it out had been enrolled in the ERS and not the PSF.

7. At the time the pension plan was altered, none of the plaintiffs had fulfilled the requirements for retirement under the PSF.

### Jurisdiction

Plaintiffs allege that federal question jurisdiction is present in this case under 28 U.S.C. § 1331(a).[9] The jurisdictional amount requirement is met. So is the "arising under" requirement of section 1331. Article I, section 10, clause 1 of the United States Constitution, the Contract Clause, provides: "No State shall pass any * * * Law impairing the Obligation of Contracts." Plaintiffs contend that there was a contract formed on October 12, 1959 between the class of police officers hired on October 12, 1959 and the County pursuant to which the County agreed that it would place those officers in the PSF, and that the County would pay those officers the benefits set forth in the PSF as of October 12, 1959. Plaintiffs contend further that the action of the County in legislatively altering the pension plan on October 15, 1959, in making those alterations retroactive to October 1, 1959 and thus applicable to the class hired on October 12, 1959, and in enrolling the class hired on October 12, 1959 in the ERS instead of in the PSF, impaired plaintiffs' contract rights in the pension benefits to which they claim entitlement, i.e., the benefits they would have received had they been enrolled in the PSF.

"For a cause of action to 'arise under' federal law, and thus to satisfy the requirements of § 1331, a federal right, privilege or immunity must be an essential element of the *plaintiff's* cause of action." *McCorkle v. First Pennsylvania Banking and Trust*

---

**8.** Plaintiffs and defendant differ sharply in their allegations of what plaintiffs knew or should have known about the two retirement plans at one or more dates prior to commencement of this suit in 1976. It does seem clear, however, that, at the least, plaintiffs knew when they were hired in October 1959 that alterations in the retirement program were then contemplated, if not already instituted, even if plaintiffs did not know precisely what the changes were.

**9.** That section reads as follows:

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

Plaintiffs also allege jurisdiction under 28 U.S.C. §§ 2201 and 2202. However, section 2201 by its own language applies only to "a case or actual controversy within [the] jurisdiction [of a federal court]." Thus, if jurisdiction is not already present in a given case, §§ 2201 and 2202 do not confer it.

*Co.*, 459 F.2d 243, 250 (4th Cir. 1972). "A federal cause of action is stated under the contract clause [of the United States Constitution] when one alleges that he or she has a contract with the state, which the state, through its legislative authority, has attempted to impair. [Citation omitted.] Mere refusal to perform a contract by a state does not raise a constitutional issue, but when a state uses its legislative authority to impair a contract a constitutional claim is stated. [Citation omitted.]" *E & E Hauling, Inc. v. Forest Preserve District of DuPage County*, 613 F.2d 675, 678 (7th Cir. 1980). In this case, plaintiffs have alleged that there was a contract between themselves and the County formed on October 12, 1959, and that by legislation of October 15, 1959 the County sought to alter that contract. Thus, subject matter jurisdiction exists in this case under section 1331.[10]

Neither *Berry v. City of Portsmouth*, 562 F.2d 307 (4th Cir. 1977) (*per curiam*), nor *Heath v. City of Fairfax*, 542 F.2d 1236 (4th Cir. 1976) (*per curiam*), leads to any different conclusion herein. In *Berry*, the district court had dismissed the action, without prejudice, for lack of a substantial federal question. The Fourth Circuit affirmed. Plaintiffs in that case had challenged an amendment to a Portsmouth City ordinance. Prior to its amendment, the ordinance by its own original terms had allowed the city to reduce the disability pension of an individual who, after he began to receive such benefits and before his normal retire-

ment date, either engaged in gainful employment or was capable of so doing. That provision in the ordinance had seemingly not been enforced. *Id.* at 310–11. The amendment, passed in 1975, did not change the power of the Board to reduce disability payments, but only instituted a requirement that individuals on disability pensions submit certain information on a given timetable to the Board of Trustees of the Fire and Police Retirement System. Presumably, the fact that the amendment was passed indicated that the Board planned to begin utilizing its power under the 1961 ordinance.

The challenge in *Berry* was thus not to the amendment as impairing a contract right to unreduced benefits, but rather to the amendment as signalling that the Board was about to begin to use the power it had been given by the 1961 ordinance. *Id.* at 311. Plaintiffs contended, *inter alia*, that the fact that fifteen years had gone by without enforcement of the existing statute created "implied contract terms" conferring a right to unreduced benefits on retirees, *id.* at 311, and that the city's action in preparing to enforce the 1961 provision impaired that implied contract between the city and its retired employees.

The Fourth Circuit, in the course of holding that that claim did not state a cause of action, wrote (at 311):

> When the City enacted its plan for certain individuals to receive disability bene-

---

10. In *Smith v. County Council of Baltimore County*, Civil No. HM 76–873 (D.Md. Sept. 21, 1976), Judge Murray of this Court dismissed the complaint in a case concerned with a Baltimore County retirement fund. Jurisdiction in that case had been alleged under 28 U.S.C. § 1331. One of the grounds for Judge Murray's decision was that, as a matter of law, there had been no violation of the Contract Clause. Slip op. at 2. A copy of Judge Murray's opinion has been placed in the court file in this case.

In *Robbins v. Police Pension Fund*, 321 F.Supp. 93 (S.D.N.Y.1970), Judge Cooper dealt with a claim by plaintiff that the failure by defendants to pay him a pension impaired his contract rights. Jurisdiction was alleged under 28 U.S.C. § 1331. Plaintiff had worked for the police department for more than twenty years, and had thus completed one of the two condi-

tions precedent to the vesting of his pension. The second condition was that he be a member of the department at the time he applied for his pension. Since he had ceased to be a member of the department at the time when he applied for his pension, his pension application had been denied. *Id.* at 97. The Court granted summary judgment for defendants. *Id.* at 94. *See also Muzquiz v. City of San Antonio*, 378 F.Supp. 949 (W.D.Tex.1974), in which the Court granted summary judgment for defendant in a case involving pension funds, although brought under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4), and not § 1331.

In *Smith*, *Robbins* and *Muzquiz*, federal courts, faced with contentions not too dissimilar to those made herein, seemingly took jurisdiction and then held in favor of the defendants.

fits under certain conditions, it reserved the right in the Board to reduce payments if the disabled employee resumed gainful employment or refused employment suitable to his capacity. Neither the Board nor the City ever relinquished the right to reduce pensions. * * *

The Court continued (at 312):

> [T]he basic question here is whether there was an implied contract [not to reduce benefits], and, if so, whether the City and the Board breached the contract. These questions are not of constitutional magnitude. [Footnote omitted.]

In *Heath*, the Court dealt with a claim by police officers of the City of Fairfax, Virginia, that the City had unconstitutionally refused to pay them certain salary increases to which they claimed entitlement under a salary scale ordinance. The Fourth Circuit decided that, on the face of the complaint, no federal jurisdiction existed, *id.* at 1239, and on that basis affirmed the dismissal of the complaint by the district court.

In so doing, the Court, in a *per curiam* opinion, emphasized that the case did not involve any claim that contract rights had been impaired through legislative action, and wrote (at 1239):

> Equally without point is *Cobb v. City of Malden*, (1st Cir. 1953) 202 F.2d 701, on which the plaintiffs rely in this Court for jurisdiction. In that case, the plaintiffs claimed a contractual right to a salary increase under a contract executed in 1947. In 1951, however, the State enacted a statute which allegedly allowed the school district to nullify the contractual right given the plaintiffs under their 1947 contract. Federal jurisdiction was properly rested, the Court found, on a claim of an unconstitutional legislative impairment of a valid and subsisting contract right. There is no such claim here and *Cobb* offers no support for plaintiffs' position.

*Berry* and *Heath* are both distinguishable from the case at bar. *Berry* did not involve a legislative change which itself resulted in a loss of contract rights to plaintiffs. In the within case, plaintiffs allege that an actual contract between themselves and the County was itself altered by means of a legislative enactment.

Additionally, *Berry*, unlike the case at bar, involved a non-contributory retirement plan which was financed entirely by the defendant City. Thus, the payments made to retirees under that plan were "paid in the first place in the discretion of the Board * * *." 562 F.2d at 311. *See Pennie v. Reis*, 132 U.S. 464, 470–71, 10 S.Ct. 149, 151, 33 L.Ed. 426 (1889); *cf. Mazor v. State of Maryland*, 279 Md. 355, 369 A.2d 82 (1977). The retirement plans involved herein are, on the other hand, contributory: both the PSF and the ERS are financed at least in part by substantial employee contributions.

In *Heath*, no legislative enactment was involved. Rather, plaintiffs in that case alleged a simple refusal by defendant to pay them money which they claimed was due them under a contract with defendant—in other words, a simple breach of contract. In fact, the Court in *Heath* implied that federal question jurisdiction might have been present had the breach alleged in that case been accomplished by means of a legislative enactment rather than by a simple refusal to pay money. 542 F.2d at 1238–39. This case, unlike *Heath*, involves a claim by plaintiffs that the County through legislative action unconstitutionally altered a contract between itself and plaintiffs. The County, according to plaintiffs, did more than refuse to abide by a contract—it legislatively altered its contract. Thus, in this case, plaintiffs have alleged a breach of the Contract Clause of the Constitution and have stated a cause of action arising under federal law so as to meet the jurisdictional requirements of section 1331.

### Merits

Preliminarily, it is to be noted that the law which is applicable, in determining when pension benefits created by state legislative action vest, whether such legislative action created a contract, and if a contract was so created, what alterations in it are permissible, is the law of the state

which either by itself or through a subdivision took such action or actions. Herein that is the State of Maryland. *See Koch v. Yunich,* 533 F.2d 80, 86–87 (2d Cir. 1976); *Kingston v. McLaughlin,* 359 F.Supp. 25, 28 (D.Mass.1972) (three-judge court) *(per curiam), aff'd mem.,* 411 U.S. 923, 92 S.Ct. 1900, 36 L.Ed.2d 388 (1973). It is also to be noted at the threshold that in order for a legislative action to impair a contract, the challenged action of the legislature must have altered an existing contract in such a manner as to impose a loss on the party claiming the impairment. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 240, 244–247, 98 S.Ct. 2716, 2720, 2722–2724, 57 L.Ed.2d 727 (1978); *United States Trust Company of New York v. New Jersey,* 431 U.S. 1, 18–21, 97 S.Ct. 1505, 1515–17, 52 L.Ed.2d 92 (1977).

■ When plaintiffs were hired on October 12, 1959, they were immediately enrolled in the ERS.[11] They were never members of the PSF. They never contributed to the PSF, they earned no pension benefits under the PSF, and they had no vested interest in any PSF benefits. Thus, the action of the County Council in altering the pension plan applicable to plaintiffs did not cause plaintiffs to lose anything which they had possessed at the time of the alteration. If plaintiffs had been enrolled in the PSF at the time they were hired, had contributed to the PSF, and, in the process of the alter-

ation, had lost the contributions which they had made to the PSF, the situation would be different. However, plaintiffs in this case never contributed any money to the PSF, and so suffered no loss when the pension plan was altered, even though that plan was altered retroactively.

Plaintiffs could not have "earned" the right to retire on half pay after 20 years until they had been in the police department for 20 years, at which time their right to retire after 20 years of service would have vested. *See Saxton v. Board of Trustees of the Fire and Police Employees Retirement System of the City of Baltimore,* 266 Md. 690, 692–94, 296 A.2d 367 (1972). Thus, even if plaintiffs had been enrolled in the PSF for a limited period of time prior to the changeover to the ERS, their right to retire on half pay after 20 years would not have vested during the three-day period between their enrollment in the PSF and the changeover to the ERS.[12]

In *Saxton,* the Court of Appeals of Maryland upheld the defendant Board's interpretation of the retirement plan at issue therein, under which the rights to certain death benefits accrued only at the time that the individual died and not at the time he had been hired. Judge Singley noted (at 694, 296 A.2d 367) that, prior to the actual date of death, the "ground rules," pursuant to

11. In the summary judgment context of this case, plaintiffs' contention that the requirements for passage of Bill No. 138 did not occur until October 15, 1959 is accepted. *See* n. 5 *supra* and n. 12 *infra.*

12. Plaintiffs initially contended that the legislation altering the pension plan became effective on October 15, 1959, and was invalidly made retroactive to October 1, 1959. The County Council considered the ordinance which altered the pension plan to be emergency legislation; as emergency legislation, the ordinance could become effective immediately upon its passage. Plaintiffs later raised the issue that the ordinance was not on a subject about which the County could act on an emergency basis, and thus that the legislation did not take effect until December of 1959. However, whether the legislation became effective in December, 1959 or on October 15, 1959 does not affect the result herein. Thus, this Court has taken plaintiffs'

initial contention—that October 15, 1959, was the effective date of the legislation—to be true, for purposes of this opinion. The importance of the October 15 date lies in the fact that it is later than October 12, 1959, the day on which plaintiffs were enrolled as police department employees. Of course, a December date would also be later than the October 12, 1959 date. The fact that the December date is two months later than the October 15, 1959 date does not affect the legal bases upon which this opinion rests. Plaintiffs at no time or times made any contributions to the PSF. Even if plaintiffs had been enrolled in the PSF on October 12, 1959, the fact that plaintiffs worked two months while enrolled in the PSF rather than three days would not have caused vesting of the right to retire on half pay after 20 years. *See* the *Saxton* case cited and discussed in the body of the within opinion. *See also* n. 5 *supra.*

which the rights to the death benefits would accrue, could be changed. " '[E]xisting [state] laws [are] read into contracts in order to fix obligations as between the parties, [and] the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order * * *.' " *City of El Paso v. Simmons,* 379 U.S. 497, 508, 85 S.Ct. 577, 584, 13 L.Ed.2d 446 (1965), *quoting Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 434–35, 54 S.Ct. 231, 238–39, 78 L.Ed. 413 (1934). The power of the legislature under applicable state law to modify its own pension contracts is part of each pension plan which a legislature enacts, whether explicitly included or not. *See Koch v. Yunich,* 533 F.2d 80, 86–87 (2d Cir. 1976).

In *Saxton,* plaintiff's husband had joined the Fire Department in 1940. In May of 1968, he was injured while performing his duties. For a year, although he was disabled, he was paid his full salary. In 1969, he was involuntarily retired; at that time, he was awarded a special disability benefit under the 1966 Baltimore City Code. In 1970, Mr. Saxton died of the injuries he had sustained in the active course of duty. In May of 1970, Mrs. Saxton applied for special death benefits. Her application was denied, "not because Lieut. Saxton's death had not been caused by the injuries, but because Lieut. Saxton had retired prior to his death." *Id.* 266 Md. at 691–92, 296 A.2d at 368.

At the time that Lieutenant Saxton was hired in 1940, the widow of a fireman became entitled to special death benefits if her husband's death occurred within one year of, and resulted from, injuries incurred in the course of his employment, whether or not he had retired prior to his death. However, at a date subsequent to the date on which Lieutenant Saxton had entered upon his employment with the Fire Department, the requirements for special death benefits were changed by legislative action to exclude from eligibility the widow of a fireman whose injuries had been incurred in the course of his employment but who had retired prior to his death. Under the changed rules, a widow became eligible for

special death benefits only if her husband had died from job-related injuries prior to retirement. Thus, under the rules—which had been changed between 1940, when Lieutenant Saxton was hired, and 1970, when he died—Mrs. Saxton was not entitled to special death benefits.

Judge Singley wrote as follows (at 694, 296 A.2d at 369):

> The right to a pension depends upon the controlling statutory provisions and the claimant must satisfactorily perform and meet all conditions precedent. * * *
>
> The ground rules here, to put it quite simply, were changed prior to the date when Lieut. Saxton sustained his injuries. *In all states municipal corporations may make reasonable modifications of a pension plan at any time before the happening of the defined contingencies.* [Citations omitted; emphasis added.]

In *City of Frederick v. Quinn,* 35 Md.App. 626, 371 A.2d 724 (1977), the Court of Special Appeals of Maryland analyzed the nature of a pension benefits agreement between a municipality and its employees and explicitly declined to adopt the theory that such an agreement constitutes an unalterable contract between a municipality and its employees. The employees in *Quinn* had joined the City police force at various times from September 12, 1942 to the date of the lower court decision. After 1951, they were covered by a "noncontributory retirement and disability benefit plan" set forth in a provision of the City Charter. *Id.* at 628, 371 A.2d at 725. That provision was repealed on May 18, 1961. "Thereafter, the officers on the police force were offered a contributory commercial insurance pension plan to take the place of the noncontributory plan. The appellees [employees] neither consented to the change nor enrolled in the new plan." *Id.*

The Court of Special Appeals stated that "a pension is more contractual than gratuitous." *Id.* at 629, 371 A.2d at 726. The Court declared that the argument that a pension is a gratuity emanating from a "compassionate and generous sovereign re-

warding his humble, devoted subjects is completely alien to our modern views of a democratic government's obligations to its citizens." *Id.* at 629–30, 371 A.2d at 726. However, Judge Lowe continued (at 630–31, 371 A.2d at 726):

> Only slightly less bemusing, on the other hand, is the picture of a citizen whose contractual strength is so formidable that the government which employs him can neither terminate nor vary the terms of the employment contract * * *.

It is reasonable to assume, as the court below found factually, that appellees were induced, at least in part, to their employment by the pension benefits held out at the time, just as they were induced by the salary then offered. [Citation omitted.] *The future benefits vested as they were proratedly earned,* just as the employees' rights to their salary vested as it was earned. Momentarily assuming for argument that the City could terminate either or both of these benefits at its option, by doing so it would have no more right to withdraw retroactively the pro rata pension benefits that had accrued than it could demand repayment of the salary the employees had earned and had been paid. To that extent at least, especially in view of the proportionate prorating provision of Section 196, the pension rights vested absolutely. The provision acts as an express assurance to the employees that pension benefits they have earned by satisfactory service cannot be divested.

But the analogy of earned salary and vested pension does not withstand prospective comparison. *The pension is not immutable and the government-employer need not keep its provisions precisely intact.* As government grows in size and complexity and as more employees draw from the fund, changes must often be made to assure the soundness of the fund and permit its growth commensurate with its prospective needs. The contrac-

tual or vested rights of the employee in Maryland are subject to a reserved legislative power to make *reasonable modifications* in the plan, or indeed to modify benefits if there is a simultaneous offsetting new benefit or liberalized qualifying condition. *Each case where a changed plan is substituted must be analyzed on its record to determine whether the change was reasonably intended to preserve the integrity of the pension system by enhancing its actuarial soundness,* as a reasonable change promoting a paramount interest of the State without serious detriment to the employee. In short, the employee must have available substantially the program he bargained for and any diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare. * * * [Emphasis added.]

The major differences between the two plans, the PSF and the ERS, have been outlined above. On the one hand, plaintiffs lost the right to retire at a full pension after 20 years of service. The contributions deducted from plaintiffs' salaries and paid into the ERS are greater than the contributions which would have been required under the PSF. In addition, the pension to a non-disabled retiree under the ERS is lower than the pension would have been to that retiree under the PSF. On the other hand, however, plaintiffs gained a fully funded, seemingly actuarially sounder,[13] self-supporting retirement plan not dependent upon the legislature allocating sufficient funds each year to keep the plan operating. In addition, the ERS provisions for refunds if the employee leaves the police force are considerably more liberal than the refunds provided for under the PSF. Furthermore, if an employee of the police department is disabled and has to retire for that reason, his pension benefits may be greater than they would have been under the PSF. In any event, it would appear that the October

---

**13.** *See Thomas v. Police Commissioner of Baltimore City,* 211 Md. 357, 359, 127 A.2d 625 (1956), in which Judge Hammond commented that a retirement fund seemingly substantially the same as the PSF was not actuarially sound. The ERS, on the other hand, is apparently fully funded. *See* p. 463 *supra.*

1959 alterations were "reasonably intended to preserve the integrity of the pension system by enhancing its actuarial soundness," *Quinn, supra* at 630, 371 A.2d at 726, and were thus permissible.

A number of state supreme and other state appellate courts have dealt with the question presented herein. In the leading case of *Harvey v. Retirement Board of Allegheny County*, 392 Pa. 421, 141 A.2d 197 (Pa.1958), the Supreme Court of Pennsylvania dealt with facts similar to the facts of the case now before this Court. In *Harvey*, plaintiff had begun working for Allegheny County on May 1, 1928. At that time, the Pension Act of May 8, 1919 was in effect. Under that Act, county employees contributed 1% of their salaries to the County Pension Fund. After having worked for the county for not less than 20 years, and after having reached age 50, an employee might retire on a pension of 50% of his average annual salary, with a maximum of $100 per month. *Id.* at 198.

Five years after plaintiff began work for the County, the legislature "substantially changed the retirement system."

> The Act of May 22, 1933, * * * increased the rate of employe monthly contributions to the pension fund from one to three per cent, and increased the voluntary retirement age from fifty to sixty years, provided that if after twenty years of service an employe were separated from county employment "by reason of no cause or act of his own," he might nevertheless retire at age fifty with full benefits. Two years later the Act of April 4, 1935 * * * increased employe contributions from three to five per cent of their monthly earnings * * *.

*Id.* at 199. Plaintiff continued to work for the county until February 28, 1951. As of that date, he was over 50 years old and had worked for the county continuously for almost 23 years. "It [was] undisputed that Harvey had fulfilled all requirements necessary to obtain the retirement allowance under the Act of 1919." *Id.* Furthermore, Harvey had contributed to the pension fund at the higher rates of contribution provided by the various changes in the statutes.

Following his dismissal [on February 28, 1951], Harvey filed an application for a retirement allowance with the defendant Retirement Board. His application was refused on the ground that he had been dismissed from his position for cause, and therefore, under the 1947 retirement law, Harvey would be required to continue to contribute to the fund until he attained age 60, at which time he would become eligible to receive the retirement allowance.

*Id.* Harvey contended that "his retirement rights were controlled by the law in effect on the date of his original employment rather than the act in effect at the time of his dismissal." *Id.* The Supreme Court of Pennsylvania rejected that argument.

> In the leading case of *Retirement Board of Allegheny County v. McGovern*, 1934, 316 Pa. 161, 174 A. 400, we declared that an employe's right to a pension under a retirement act is constitutionally protected against subsequent alteration by the legislature once the employe fulfills the conditions prerequisite to the receipt of retirement pay. * * * *The Court [in McGovern] held * * * that until an employe had fulfilled all of the prerequisites to receiving a pension, the legislature, at least in order to protect and maintain the actuarial soundness of the retirement fund, might exercise a power impliedly reserved to alter the contract of employment and retirement.*

> " * * * [U]nderlying all retirement systems of the class we are now discussing, is the legislative object, as well as that of the member employee, that a substantial reserve be built up so that the actuarial soundness of the plan cannot be questioned. * * * The legislature may from time to time * * * alter, change, amend, and render intact the actuarial soundness of the system so as to strengthen its fibers in any way it sees fit. *Changes and details, such as length of service required, contributions needed, and age requirements, to keep the fund on sound actuarial practices, are essential.*

* * * 316 Pa. at pages 175–76, 174 A. at page 407 (Emphasis supplied [in the Harvey opinion]). * * * Id. at 200. The Court further stated that "all members of a retirement system * * benefit from the maintenance of an actuarially sound retirement fund." Id.

The Court concluded that Harvey was subject to the Retirement Act of 1933. It noted that the change in retirement age from 50 to 60 years old was permissible. "Since an increase in retirement age is related to maintaining the actuarial soundness of a pension fund, [case cited], this provision of the Act of 1933 applied to all employes who, on the effective date of the act, had not attained eligibility to receive a retirement allowance." Id. at 203.

In Eisenberger v. Police Pension Commission of City of Harrisburg, 400 Pa. 418, 162 A.2d 347 (1960), the Supreme Court of Pennsylvania relied on Harvey in holding that certain modifications in a pension plan between the City and its policemen were permissible. In Eisenberger, the pension plan had been altered three months after the plaintiff had joined the police force in 1938. Under the plan which was in effect at the time plaintiff was hired, a policeman had to work for 20 years and be 55 years old in order to be eligible for a pension. Under the plan as altered, a policeman had to work for 25 years and be 50 years old prior to becoming eligible for retirement. The Supreme Court of Pennsylvania spoke as follows (162 A.2d at 348–49):

Applying the * * * rule [of Harvey v. Allegheny County Retirement Board, 392 Pa. 421, 141 A.2d 197 (Pa. 1958)] to the instant case, it is obvious that appellant's rights must be determined under Ordinance No. 94 (1938–39), with its minimum service requirement of twenty-five years, rather than Ordinance No. 95 (1920–21) which only required twenty years service. The length of service required to qualify an individual for a pension is a material part of the retirement system, and is one of the material actuarial components necessary for the establishment and operation of a proper retirement system. While the City of Harrisburg cannot alter the terms of a pension contract without the consent of the employee if he has already satisfied the conditions for receiving a pension, the city by ordinance, as well as the legislature by enactment, prior to the employee's fulfillment of the conditions, may change or add to these conditions when such changes enhance the actuarial soundness of the fund. That was the rule established in Harvey and that is the rule which we now apply. Clearly, the change made by Ordinance No. 94 in increasing the period of service from twenty years to twenty-five years, enhances the actuarial soundness of the fund. * * *

The approach of the Pennsylvania Supreme Court in Eisenberger had been earlier summarized in Harvey as follows (141 A.2d at 203):

1. An employe who has complied with all conditions necessary to receive a retirement allowance cannot be affected adversely by subsequent legislation which changes the terms of the retirement contract.

2. An employe who has not attained eligibility to receive a retirement allowance may be subject to legislation which changes the terms of the retirement contract if the change is a reasonable enhancement of the actuarial soundness of the retirement fund.

3. An employe who has not attained eligibility to receive a retirement allowance may not be subject to legislation which changes the terms of the retirement contract if the change does not reasonably enhance the actuarial soundness of the retirement fund. [Footnote omitted.]

The same or a similar approach has seemingly been adopted by a majority of other state courts which have considered the issue.[14] The federal courts have adopted a

---

14. See, e. g., Ruster v. Ruster, 40 Cal.App.3d 379, 382, 114 Cal.Rptr. 812, 813–14 (1974); In re State Employees' Pension Plan, 364 A.2d 1228, 1235–36 (Del.1976); State v. City of Jack-

similar approach to pension plans created by Congress, in cases in which plaintiffs have alleged violations of due process.[15] The New York and Georgia courts have seemingly indicated, however, that no modification of a pension contract between a governmental body and its employees which would lead to a reduction in pension benefits is permissible after an employee has entered upon his employment.[16] The highest court of Maryland in *Saxton* and more recently in *Robert F. Foley Co. v. Washington Suburban Sanitary Commission*, 283 Md. 140, 389 A.2d 350 (1978),[17] and the next highest court of Maryland in *Quinn* have not followed either an unalterable contract approach or a no-contract approach. In permitting legislative modifications in a public employee pension plan if those modifications are reasonable and/or would tend to enhance the actuarial soundness of the plan, the Maryland courts follow the majority approach. Under the Maryland approach, which governs herein, the 1959 modifications made by Baltimore County are valid; that is, they are valid if they do not offend the Contract Clause of the federal Constitution as that clause has been interpreted and applied by the Supreme Court of the United States.

In the last several years, the Supreme Court has written extensively about the Contract Clause in two opinions. The first such case is *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977), in which Mr. Justice Blackmun wrote in his 4–3 majority opinion:

> Although the Contract Clause appears literally to proscribe "any" impairment, this Court observed in *Blaisdell [Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934)] that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." 290 U.S. at 428, 54 S.Ct. at 236 * * *.

Subsequently, the Justice commented (*id.* at 23–26, 97 S.Ct. at 1518, 1519; footnotes omitted):

> The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. As early as *Fletcher v. Peck*, the Court considered the argument that "one legislature cannot abridge the powers of a succeeding legislature." 6 Cranch [87], at 135, 3 L.Ed. 162. It is often stated that "the legislature cannot bargain away the police power of a State." *Stone v. Mississippi*, 101 U.S. 814, 817, 25 L.Ed. 1079 (1880). This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to

---

*sonville Beach*, 142 So.2d 349, 352 (Dist.Ct. App.Fla.1962), *aff'd*, 151 So.2d 430 (Fla.1963); *Opinion of the Justices*, 364 Mass. 847, 303 N.E.2d 320, 328 (1973). *See also Clarke v. Ireland*, 122 Mont. 191, 199 P.2d 965, 970 (1948). *Cf. Muzquiz v. City of San Antonio*, 378 F.Supp. 949 (W.D.Tex.1974); *City of Birmingham v. Penuel*, 242 Ala. 167, 5 So.2d 723, 728 (1942); *Jones v. Cheney*, 253 Ark. 926, 489 S.W.2d 785, 792 (1973); *Miles v. Tennessee Consolidated Retirement System*, 548 S.W.2d 299, 306 (Tenn.1976); *Fazekas v. University of Houston*, 565 S.W.2d 299, 304–05 (Tex.Civ. App.1978), *app. dism'd for want of a substantial federal question*, 440 U.S. 952, 99 S.Ct. 1487, 59 L.Ed.2d 765 (1979).

**15.** *See, e. g., Nestor v. Folsom*, 169 F.Supp. 922 (D.D.C.1959), *rev'd on other grounds, Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

**16.** *See Robbins v. Police Pension Fund*, 321 F.Supp. 93, 98 (S.D.N.Y.1970), *quoting Birnbaum v. New York State Teachers Retirement System*, 5 N.Y.2d 1, 176 N.Y.S.2d 984, 989, 152 N.E.2d 241, 245 (1958), *Bender v. Anglin*, 207 Ga. 108, 60 S.E.2d 756, 760, *cert. denied*, 340 U.S. 878, 71 S.Ct. 125, 95 L.Ed. 638 (1950).

**17.** In *Foley*, Judge Eldridge referred to the case law in a number of jurisdictions (at 152–54, 389 A.2d 350) and also (at 151–52, 389 A.2d 350) related the Maryland view to the Supreme Court's holdings in *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), which are discussed *infra* in the body of this opinion.

adhere to a contract that surrenders an essential attribute of its sovereignty.

\*　　\*　　\*　　\*　　\*　　\*

The instant case involves a financial obligation and thus as a threshold matter may not be said automatically to fall within the reserved powers that cannot be contracted away. \* \* \*

\* \* \* The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

In *United States Trust*, the majority of the Supreme Court held that the repeal by a state of its own contractual undertaking with bondholders was an unconstitutional impairment of contract. The covenant with the bondholders constituted a financial obligation of the states of New York and New Jersey to the bondholders. The statutory language itself provided that " '[t]he 2 States covenant and agree with each other and with the holders of any affected bonds.' " *Id.* at 18, 97 S.Ct. at 1515.[18] The repeal of the covenant in question was not for the "purpose of benefiting the bond-holders." *Id.* at 28, 97 S.Ct. at 1521. "It [also could] not be said that total repeal of the covenant was essential \* \* \* [or that] a less drastic modification" would not have sufficed. *Id.* at 29–30, 97 S.Ct. at

1521. Further, the Court "[could] not conclude that repeal of the covenant was reasonable." *Id.* at 31, 97 S.Ct. at 1522. Thus, the total repeal of the covenant violated the Contract Clause.

*United States Trust* is distinguishable from the case at bar on several grounds. In this case, plaintiffs can point to no language which indicates that the County Council intended to contract away its power to modify the pension plan. The pension plan, while it was modified in part because the PSF was more expensive to the County than the ERS, was also modified in ways which benefited plaintiffs. In addition, the pension plan herein was not repealed, it was only altered: the modifications did not leave plaintiffs with nugatory pension contracts, but rather with sounder, albeit somewhat smaller, pensions.

A little more than a year after *United States Trust* was decided, the Supreme Court, in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), dealt with a state statute which imposed a substantial " 'pension funding charge' " on an employer if that employer "either terminated [his retirement] plan or closed a Minnesota office," and if that employer's "pension funds were not sufficient to cover full pensions for all employees who had worked at least 10 years." The statute "required the employer to satisfy the deficiency by purchasing deferred annuities." *Id.* at 238, 98 S.Ct. 2719, 2720.

In *Spannaus*, the pension plan between the plaintiff company and its employees had been adopted by the company in 1963. The company, in its plan, "retained a virtually unrestricted right to amend the plan," and could also "terminate the plan and distribute the trust assets at any time and for any reason." *Id.* at 237, 98 S.Ct. at 2719. The additional cost to the company resulting from the challenged state statute,

---

**18.** In this case, plaintiffs have pointed to no language to show that the Baltimore County Council intended to contract away its own power to amend the retirement statutes, *see United States Trust Company of New York v.* *New Jersey*, 431 U.S. 1, 23–24 & nn. 20 & 21, 97 S.Ct. 1505, 1518 & nn. 20 & 21, 52 L.Ed.2d 92 (1977); *Robert T. Foley Co. v. Washington Suburban Sanitary Commission*, 283 Md. 140, 154, 389 A.2d 350 (1978).

passed in 1974, was $185,000.00. *Id.* at 239, 98 S.Ct. at 2720.

Mr. Justice Stewart, in a 5–3 majority opinion, noted that the statute, adopted eleven years after the company instituted its pension plan, "substantially altered" the relationship between the company and its employees. *Id.* at 240, 98 S.Ct. at 2720. While the Contract Clause is not absolute and does not "obliterate the police power of the States," *id.* at 241, 98 S.Ct. at 2721, it does "impose *some* limits upon the power of a State to abridge existing contractual relationships." *Id.* at 242, 98 S.Ct. at 2721 (emphasis in original).

> [T]he first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

*Id.* at 244–45, 98 S.Ct. at 2723 (footnotes omitted).

The statute in *Spannaus* both substantially and retroactively modified the compensation the company had agreed to pay its employees.

> Not only did the state law thus retroactively modify the compensation that the company had agreed to pay its employees from 1963 to 1974, but it did so by changing the company's obligations in an area where the element of reliance was vital— the funding of a pension plan. * * *
>
> Moreover, the retroactive state-imposed vesting requirement was applied only to those employers who terminated their pension plans or who, like the company, closed their Minnesota offices. * *
>
> Thus, the statute in question here nullifies express terms of the company's contractual obligations and imposes a completely unexpected liability in potentially disabling amounts. There is not even any

provision for gradual applicability or grace periods. * * * Yet there is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem. * * *

> * * * * * *

> Entering a field it had never before sought to regulate, the Minnesota Legislature grossly distorted the company's existing contractual relationships with its employees by superimposing retroactive obligations upon the company substantially beyond the terms of its employment contracts. * * *
>
> * * * [The law] did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken * * *. And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.

*Id.* at 246, 247, 249–50, 98 S.Ct. at 2724, 2726.

Like *United States Trust, Spannaus* is distinguishable from the case before this Court. In this case, the County Council had entered the field of pension plans well before 1959. In modifying the pension plan applicable to plaintiffs, the Council exercised a discretion which, under state law, it had implicitly retained when the original plan was enacted. In altering the pension plan applicable to plaintiffs, the Council did not discriminate against plaintiffs, but rather made the pension plan applicable to them more like the one already applicable to other County employees. The Council did not substantially alter the relationship between the County and plaintiffs by modifying the pension plan. In *Spannaus* the Minnesota legislature intervened in a contract between two private parties. The Court in *Spannaus*, while it emphasized the importance of properly and fully vested pension plans, *id.* at 246–47, 98 S.Ct. at 2723–24, stated that the action of the legis-

lature in that case was too drastic to be permissible. In this case, the County Council acted to change its own earlier enactment and in so doing provided plaintiffs with a seemingly sounder plan. Accordingly, nothing in the majority opinions in *Spannaus* or *United States Trust* indicates that the Baltimore County 1959 changes in issue in this case were other than validly made. It is also to be noted that the approach in the minority opinions written by Mr. Justice Brennan in both of those cases, with Mr. Justice White and Mr. Justice Marshall concurring, calls for a much more limited application of the Contract Clause and an even broader grant of authority to state legislatures to modify their earlier contractual-type enactments than do the majority opinions in the two cases. Thus, all of the opinions in *United States Trust* and *Spannaus* agree that not every impairment by a legislature of its contractual-type undertakings constitutes a violation of the Contract Clause of the federal Constitution. Herein there seemingly was no impairment because no contract rights had vested when the legislative change was made. But even if the change constituted an impairment, it was a reasonable change and therefore a change which did not constitute a violation of the rights under the Contract Clause of any member of the plaintiff class or classes.

For the reasons set forth in this opinion,[19] defendant's motion to dismiss, treated as a motion for summary judgment, will be granted and judgment will be entered for defendant.

---

**19.** Plaintiffs instituted the within suit on July 8, 1976, some 17 years after October 1959. The County has raised the affirmative defense of laches. Even though plaintiffs might not have known precisely what the changes in the pension plan were, they did know or have reason to know in October 1959 that changes had been or were then going to be made because each member of the class was sent a letter dated September 29, 1959 to that effect. Further, when hired, each member of the plaintiff class seemingly executed a Designation of Beneficiary form, which on its face indicated that the executor of the form has been enrolled in the ERS. Plaintiffs seek to justify the delay with allegations that the new policemen were afraid to "rock the boat," and the like.

In order for laches to succeed as a defense, there must not only be unjustifiable delay, but also prejudice to defendant. *Wohl v. Keene*, 476 F.2d 171, 176 (4th Cir. 1973). Defendant claims prejudice because of the amount of administrative effort which would be required to transfer each member of the plaintiff class from the ERS to the PSF. Such transfer would involve calculations for each member of the plaintiff class of the amount paid into the ERS over the 17 or more years, the amount which would have been paid into the PSF during those years, and the like.

Many of the cases, discussed *supra* in the body of this opinion, which involve similar issues to those raised in the case at bar, were not initiated until the time at which eligibility for retirement was claimed, rather than at the time of the alteration in the pension plan. However, the courts have seemingly not applied the doctrine of laches in holding against the plaintiff claimants in those cases. Plaintiffs in this case could have brought suit sooner and sought relief identical to the relief sought herein. It is to be noted that they did not wait to initiate suit until they had fulfilled the 20-year service requirement. It is also to be noted that the nature of the pension contract in this and other public employee pension plan cases is such that the right to retire after a certain number of years of service may not vest until that service requirement has been met; thus, the actual breach arguably does not occur until that point in time. In any event, in this case, the issue of laches need not be reached.