635 A.2d 36

**William A. DAVIS**

v.

**MAYOR AND ALDERMAN OF the CITY OF ANNAPOLIS, et al.**

**No. 559, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Jan. 5, 1994.

Timothy F. Talbot (Joel L. Katz, P.A., on the brief), Annapolis, for appellant.

Jonathan A. Hodgson, Annapolis, for appellees.

Argued before GARRITY, BLOOM and CATHELL, JJ.

CATHELL, Judge.

On May 24, 1989, and December 5, 1990, William A. Davis, appellant, an Annapolis City police officer, injured and then reinjured his right thumb. Ultimately, he applied to the Public Safety Disability Retirement Board (Board) to determine his ability to function as a police officer and for disability benefits. Several additional petitions and petitions for reconsideration were filed. For our purposes, all were essentially denied. After the denials, petitions for mandamus or amended petitions for mandamus were filed in the Circuit Court for Anne Arundel County. The court ultimately denied the petition for mandamus filed subsequent to the Board's last determination.

The Board concluded:

After due consideration of the record of this hearing, the Public Safety Disability Retirement Board finds as follows:

1. It is the law of the City of Annapolis as presently codified at Section 3.36.080 that this Board is legally empowered to grant disability retirement benefits only to those applicants who are "wholly and permanently prevented as a result of bodily injury or disease from performing any job in the police department". The Board decided by vote of 3–2 that this is the legal standard governing the actions of the Board. Those voting in the majority on this issue were Board Members Rodowsky, Watson and Avery. Those Board Members voting against this decision were Lord and Fellowes.

2. Officer William A. Davis is not presently capable of performing the duties of a certified police officer of the City of Annapolis but he is not wholly and permanently prevented as a result of his injury from performing any job in the Annapolis Police Department.

3. The injury to the Applicant's hand, which forms the basis of his application for disability retirement benefits, is service related.

The application of Officer Davis for disability retirement is denied.

Appellant presents us with two issues:

I. Whether the Board's retroactive application of section 3.36.080 impairs the appellant's contract rights in violation of the charter and code of the City of Annapolis and the collective bargaining agreement.

II. Whether the Board abused its discretion in denying appellant's application for occupational disability retirement.

## Facts

Appellant was examined by several doctors to determine the cause and extent of his injuries. Dr. Settle found that appellant was disabled "from the general duties of a police officer." Dr. Goldstein stated: "Although he has been back to light duty and clerical work, even this is difficult" and found that appellant will "likely never be able to return to the full duties of his occupation." Dr. Dennis opined: "I do not think that this gentleman is able to fulfill his full duties...." Dr. Steele stated that appellant "has not regained the strength and full function required to use a firearm.... [H]e may need training for an alternative position which does not require him to use a firearm." Dr. Steele and Dr. Dennis opined that appellant had a 37% permanent disability. There was also some expert testimony that some of the disability was caused by pain and that the pain might be reduced by additional surgery.

Appellant remained employed with the Annapolis Police Department throughout all the proceedings, capably performing the functions assigned to him. Other facts will be addressed as necessary.

## II

We shall address appellant's second issue first, because a legal matter pertinent to that issue is determinative of this case's outcome.

On June 23, 1986, the applicable ordinance, 0–26–86 AMENDED, defined occupational disability retirement. The ordinance then stated that when a member was "INCAPACITATED *PERMANENTLY* FROM ACTIVE SERVICE ... THE MEMBER'S DISABILITY RETIREMENT PENSION SHALL BE 66⅔ PER CENT OF THAT MEMBER'S ANNUAL EARNINGS AT THE DATE OF RETIREMENT." A further amendment to the disability Ordinance was passed in October of the same year (0–39–86 AMENDED) providing for a Public Safety Disability Retirement Board. The later ordinance made no substantive changes in the standard of review in respect to occupational disability retirement stated in the former ordinance. It merely created an agency (the Board) to apply the existing standards and provided for certain procedures relating to hearings, reviews, determinations, continuances, rehearings, etc.

It was not until Ordinance 0–33–91 AMENDED was finally adopted, effective August 12, 1991, that the actual applicable standard was changed.[1] It stated, in relevant part, that a member would be permanently incapacitated for disability pension benefit purposes if "WHOLLY AND PERMANENTLY PREVENTED FROM ENGAGING IN ANY OCCUPATION ... OR (II) WHOLLY AND PERMANENTLY PREVENTED ... FROM PERFORMING ANY JOB IN THE FIRE OR POLICE DEPARTMENT...."

Thus, the 1991 ordinance changed the standard created by the 1986 ordinance from

INCAPACITATED *PERMANENTLY* FROM ACTIVE SERVICE

to

WHOLLY AND PERMANENTLY PREVENTED FROM ENGAGING IN ANY OCCUPATION ... OR ... WHOLLY AND PERMANENTLY PREVENTED ... FROM

---

1. Labor agreements made prior to this time reserved to the City the right to later change the pension provisions. But the actual change did not occur until later. In any event, the Union agreements have no role in the resolution of the issue here.

PERFORMING ANY JOB IN THE FIRE OR POLICE DEPARTMENT....

As we have noted in the instant case, the Board applied the standards set out in the 1991 ordinance.

We next note that the status of the Union negotiations in 1990 or 1991, or whether the Union was appellant's agent and spoke for him in respect to those negotiations and agreements, or even whether the ultimate agreement interfered with the contractual rights of appellant, makes no difference in our decision. As we hold that the 1986 statute should be applied in this case, the effect of the 1991 statute is not directly implicated—though some of what we shall discuss may well affect its prospective application in other cases.

## Impairment of Contractual Rights

In pension matters, the laws of "vesting" and of "rights" and of "impairment" of contracts have been discussed primarily in foreign pension cases, but, to some extent, in Maryland as well.

The Supreme Court of Nebraska in *Halpin v. Nebraska State Patrolmen's Retirement System,* 211 Neb. 892, 320 N.W.2d 910 (1982), after holding that a patrolman's pension rights were contractual in nature, was faced with resolving the effect of the State's unilateral modification of the benefits. Prior to January 4, 1976, the Nebraska Board had included in the final average monthly salary for retirement computation purposes the payment received for unused vacation and sick leave. Beginning on that date, based upon an Attorney General's opinion to the Board, unused vacation and sick leave were excluded from the computation. *Id.* 320 N.W.2d at 912. There was evidence that over the years patrolmen had continually been advised that the leave and vacation credits would be included and that it factored into the patrolman's decision to join and remain in the State Police. Some patrolmen who were eligible to retire before the change but remained also complained that the change had reduced their annuity. *Id.*

The Court first limited its decisions to patrolmen who were members before the change, then noted the constitutional issue.

"Where ... it is claimed that the contract clause prohibits a state's statutory modification of its own obligations, the court must determine whether contractual obligations within the purview of the contract clause exist; if so, whether the state legislation ... impaired those obligations; and if there is an impairment of contract, whether it is forbidden by the Constitution." *Pineman v. Oechslin,* 494 F.Supp. 525, 538 (D.Conn.1980).

*Id.* 320 N.W.2d at 913. In determining that pension rights were contractual in nature (overruling one of its prior cases in the process), the court acknowledged that not every modification of a contract impairs the obligation of contract under federal constitutional law. It was then determined that the change had diminished the benefits theretofore applied "without an offsetting increase in benefits." *Id.* at 914. The Court also accepted that impairments are not necessarily unconstitutional and "may yet pass constitutional muster if they are *'both reasonable and necessary'*" to serve an important public purpose. *Id.* at 915 (quoting *Pineman,* 494 F.Supp. at 548 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 29, 97 S.Ct. 1505, 1521, 52 L.Ed.2d 92 (1977))).

However ... the application of the tests of necessity and reasonableness requires a much greater degree of judicial scrutiny in cases ... involving [state action] which purports to abrogate a state's own financial obligation than in cases involving an impairment by the state of purely private contracts. [Brackets in original.]

*Id.* The *Halpin* court framed the rule:

" 'To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.' "

*Id.* (quoting *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467, 475 (1980)). The court noted that various courts had held that a heavy burden on a governmental unit was not, by itself, a permitted justification for scaling down contractual benefits. *Id.* The court concluded that:

[T]he change would result in disadvantages to them without "comparable new advantages." We find that the defendants' change in calculating ... annuities resulted in an unconstitutional impairment of plaintiffs' contractual rights....

*Id.* 320 N.W.2d at 916 (citation omitted).

In *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467 (1980), an officer who had been an employee for some years contended that a statute mandating increased contributions to the pension plan was an unconstitutional impairment of the officer's pre-existing contractual pension right. The Supreme Court of Kansas held:

[I]nsofar as the rights of active employees in and to pension plans are concerned, the reasonableness of legislative changes is to be measured by the advantage or disadvantage to the affected employees as a group or groups; validity of change is not dependent upon the effect upon each employee.

... [A] municipality may make reasonable changes ... but changes which result in disadvantages ... must be accompanied by offsetting or counterbalancing advantages.

*Id.* 607 P.2d at 475–76.

The Nebraska and Kansas cases fairly identify the majority view of pension plans as contractual in nature though subject to modification under appropriate circumstances. There are two other views. The first is a strict contract (not unilaterally modifiable) approach as represented by *Yeazell v. Copins,* 98 Ariz. 109, 114–17, 402 P.2d 541, 545–46 (1965). Under this approach, a pension is contractual and cannot be unilaterally modified by the government under any circumstance. The second view considers pension benefits to be mere gratuities

from the government to the employee, alterable by the government at any time.

■ Maryland has clearly placed itself in the majority view—pension benefits are contractual, but under certain circumstances the government may unilaterally modify them so long as the changes do not adversely alter the benefits, or if the benefits are adversely altered, they are replaced with comparable benefits.

In *City of Frederick v. Quinn*, 35 Md.App. 626, 627, 371 A.2d 724 (1977), the primary issue presented was:

[W]hether The City of Frederick could unilaterally repeal a noncontributory police pension plan, retroactively divesting the interest of the employees who chose not to participate in a substituted contributory plan offered by the City.

We noted that the circuit court had found the employee's pension rights were contractual in nature and had found that the employees

by virtue of their service ... prior to the repeal of Article XVI, section 196 ... had vested pension rights as set forth therein which still remain in effect and cannot be modified, repealed or defeated by the City's unilateral act.

*Id.* We noted that, while we agreed in principle, the trial court's finding was "far too rigid and a step beyond that which we believe to be the law in this State." *Id.* at 628, 371 A.2d 724. We considered that the trial court's "strict" contract theory had been premised in part in its reliance on *Yeazell,* 98 Ariz. 109, 402 P.2d 541, and then opined:

[W]e agree that a pension is more contractual than gratuitous.... The medieval ... concepts of a compassionate ... sovereign rewarding his humble ... subjects is completely alien....

Only slightly less bemusing ... is the picture of a citizen whose contractual strength is so formidable that the government which employs him can neither terminate nor vary the terms of the employment....

It is reasonable to assume ... that appellees were induced, at least in part, to their employment by the pension benefits held out at the time....

... The pension plan is not immutable and the government-employer need not keep its provisions precisely intact.... The contractual ... rights of the employee in Maryland are subject to a reserved legislative power to make *reasonable modifications* in the plan, or indeed to modify benefits if there is a simultaneous offsetting new benefit or liberalized qualifying condition.... In short, the employee must have available substantially the program *he bargained for* and any diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare....

If reasonable substitution is offered by an employer and it is declined by the employee, he is barred *prospectively* from further claims upon the rejected plan and is obviously not eligible to claim under the substitute plan. But the rights which have accrued under the terminated plan may not be retrospectively withdrawn from him.

*Id.* 35 Md.App. at 629–31, 371 A.2d 724 (emphasis added, citations omitted). *See also Quesenberry v. Washington Suburban Sanitary Comm'n,* 311 Md. 417, 423, 535 A.2d 481 (1988) ("rights ... contractual in nature, although under certain circumstances they may be modified by the unilateral action of the employer"); *Board of Trustees of the Employees' Retirement System v. Mayor and City Council,* 317 Md. 72, 100, 562 A.2d 720 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). In any event, reasonable modifications may be made at any time "before the happening of the defined contingencies." *Saxton v. Board of Trustees of the Fire and Police Employees Retirement System,* 266 Md. 690, 694, 296 A.2d 367 (1972).

In discussing pension contracts between employees and the State, the Federal District Court, applying Maryland law, in *Maryland State Teachers Assoc., Inc. v. Hughes,* 594 F.Supp. 1353 (D.Md.1984), stated initially: "Such a contract is not one as to which one legislature can bind subsequent legislatures

for work and services to be performed by State employees and teachers *in the future.*" *Id.* at 1362; *Quinn,* 35 Md.App. at 630–31, 371 A.2d 724. The court noted that *Quinn* requires the courts to determine whether pension plan changes "tend to enhance the actuarial soundness of the plan.... [T]he court must also assess the detriment to the employees. A diminution ... may be found non-serious ... if ... offset by benefits received or if the loss is justified by countervailing public welfare equities." *Id.* at 1363.

The court next noted that the changes in the plan did not deny vested or merely earned pension rights retroactively, and opined:

> [T]he legitimate expectations ... did not include an immutable, unalterable pension plan as to *future* benefits to be earned pro rata by *future* employment service.... [N]ot only would such a contract have been void *ab initio* as a surrender of an essential element of the State's sovereignty, but writings ... and an opinion of the Court of Special Appeals of Maryland roughly contemporaneous with the 1979 Act should have made anyone interested aware that Maryland law would not extend unalterable contractual protection against change in pension benefits which were to be earned on a pro rata basis by employment service in the future.

*Id.* at 1364 (emphasis omitted). While the Court held that there was no unconstitutional impairment of contracts, it opined that whatever impairment existed was caused by the fact that the State was addressing a financial crisis and responding for an "important and legitimate public purpose." Id. at 1365.

If, in the case *sub judice,* the 1991 amendment's disability provisions, that an employee must be "WHOLLY AND PERMANENTLY PREVENTED FROM ENGAGING IN ANY OCCUPATION ... FROM PERFORMING ANY JOB IN THE FIRE OR POLICE DEPARTMENT" is a modification of the prior provision that a member had to be "INCAPACITATED *PERMANENTLY* FROM ACTIVE SERVICE,"

then the validity of the change, under Maryland's (and the majority view) concept, would depend upon whether the subsequent 1991 change diminished the disability benefits under the prior law without conferring other comparable benefits to the class. Were it necessary in this case to make that decision, we would first have to define "active service" under the old statute in order to compare it with the "any job" provision of the new.

■ We do not reach that issue, however. The new statute's provisions apply, in any event, only prospectively as to disability rights that have not theretofore arisen. Appellant's contractual rights to disability benefits vested under his previous pension contract prior to adoption of the new ordinance.[2] We explain.

In *Saxton,* 266 Md. at 691–92, 296 A.2d 367, Lt. Saxton was injured in the line of duty. The injuries were incapacitating. He was, nevertheless, paid his full salary for a year before being involuntarily retired. He requested and received a special disability benefit then provided for by the Baltimore City Code. Eight months later, he died and his widow applied for special death benefits. At the time the widow applied for death benefits, the statute provided that the "member" had to have died while "*in service.*" *Id.*

Mrs. Saxton contended that, because the statute that existed prior to the time of Lt. Saxton's injuries would have permitted her to make a claim provided Lt. Saxton had died within one year of his active service, she should have been permitted to maintain the action. *Id.* at 692–93, 296 A.2d 367. In rejecting her claims, the Court of Appeals noted:

> The right to a pension depends upon the controlling statutory provisions and the claimant must satisfactory perform and meet all conditions precedent....

---

2. Because the "rights" to disability benefits vested in this case in 1989 and 1990, we need not decide whether any employee, prior to an injury, has a "right" to disability benefits. In some jurisdictions it has been held that no rights exist until an injury occurs.

The ground rules here ... were changed prior to the date when Lieut. Saxton sustained his injuries. In all states [3] municipal corporations may make reasonable modifications of a pension plan at any time *before the happening of the defined contingencies.*

. . . .

... [T]he one [statute] before us clearly posits entitlement upon death of a "member in service."

*Id.* at 694–95, 296 A.2d 367 (emphasis added).

Because the statute in effect and controlling at the time Lt. Saxton incurred the injury that resulted in his death required the death to occur while he was in service, the widow was denied benefits, even though the prior statute would have permitted the granting of widow's benefits. The opposite factual situation exists in the case at bar. A statute passed after appellant incurred the injury resulting in his disability has been applied to deny him benefits while the statute that existed at the time the injuries occurred, by the application of its different standards, might have permitted the granting of benefits.

The court in *Baker v. Baltimore County,* 487 F.Supp. 461, 467 (D.Md.1980), *aff'd mem.,* 660 F.2d 488 (4th Cir.1981), applying Maryland law, interpreted *Saxton* as establishing that when a right is created in a pension plan, *i.e.,* death-disability, etc., that right accrues at the time of the occurrence. In the case at bar the occurrence is the injuries giving rise to the claims for disability. In *Saxton,* the pension plan changes had occurred prior to the injuries leading to Saxton's death and, thus, the changes applied. In the present case, the changes—the new ordinance followed by the board—took place after the injuries occurred.

The foreign jurisdictions are generally in accord. They include the decision of the Arizona Court of Appeals in *Fund Manager, Public Safety Personnel Retirement System v. City*

---

**3.** Except those few who have adopted a "strict contract concept." *Yeazell,* 98 Ariz. at 109, 402 P.2d at 541.

*of Phoenix Police Dept.,* 151 Ariz. 487, 728 P.2d 1237 (App. 1986). The Arizona case was concerned with the point in time where an officer's rights in the disability provisions of a pension plan arose, when the provisions were altered after the officer became employed. That plan's alteration was similar to that in the case at bar, in that it, in effect, changed the disability qualification from an injury that prevented the performance of regularly assigned duties to an injury that prevented a reasonable range of duties within the department. The officer was injured after the plan was changed. *Id.* 728 P.2d at 1238. The court distinguished general "vesting" which occurs upon employment or enrollment in the plan from a right under the plan that only comes into "existence upon an event or condition which may not happen," *Id.* at 1239, holding:

> [T]hat a public employee's right to or interest in a disability pension vests upon the occurrence of the event or condition which would qualify him for such pension—the injury.

*Id.* (citing *State v. Funkhouser,* 52 Wash.2d 370, 325 P.2d 297, 299 (1958) ("When one's contract of employment includes service connected disability rights, those rights become vested at the instant the employee is injured in the course of his employment."))

The disability question at issue in the case *sub judice* must accordingly be determined by the provisions of the plan in effect as of the injury dates—1989 and 1990—not by the amended plan's provisions which went in effect on July 12, 1991.

Because our resolution requires a remand for the Board to apply the proper law, we do not need to address whether the new plan is, in fact, a unilateral modification by the City or a bilateral modification (given the allegations that it has been agreed upon by the appellant's bargaining agent). Nor do we need to address whether, if it is a unilateral modification, it has deprived the class of disabled beneficiaries of benefits not matched by comparable benefits granted. Further, we need not address the relevant necessity and policy issues regarding

the new plan's adoption. The new plan applies, if at all, only to disability claims arising from injuries that occurred subsequent to its adoption. Appellant's injuries in the case at bar occurred prior to its adoption and are governed under the pre-existing statute.

We vacate the trial court's order and direct it to remand this case to the Board with directions to reconsider appellant's claims using the standard set out in the pre-1991 ordinance.

JUDGMENT VACATED; CASE REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.