Parker ANDREWS, et al., Plaintiffs,

v.

**ANNE ARUNDEL COUNTY, MARYLAND, Defendant.**

**Civil Action No. AMD 96–173.**

United States District Court,
D. Maryland.

May 31, 1996.

Glenn M. Cooper and David M. Rothenstein, Bethesda, MD, for plaintiffs.

Phillip F. Scheibe, County Attorney and David A. Plymyer, Annapolis, MD, for defendant.

## MEMORANDUM OPINION

DAVIS, District Judge.

## I. INTRODUCTION

The plaintiffs are 13 former appointed and elected officials of Anne Arundel County, Maryland, all but one of whom retired from county employment between 1990 and 1994 pursuant to provisions of the County Retirement Plan for Appointed and Elected Officials (the "A & E Plan"). The defendant is Anne Arundel County—a chartered Maryland county ("the County"). Md.Code Ann., Art. 25A (1957, 1994 Repl.Vol.).

In 1994 and 1995, the County Council adopted, and the County Executive signed into law, Bill Nos. 61–94 and 74–95, respectively. The express purpose of these enactments was to reduce retroactively pension benefits ordinarily payable to plaintiffs and plaintiffs' survivors, and otherwise to effect cost-saving changes in the A & E Plan. Plaintiffs filed this action to enjoin the application of these bills to them and to recover lost benefits.

This action was originally filed in the Circuit Court for Anne Arundel County, Maryland. The plaintiffs' initial pleading was a complaint for ex parte and interlocutory injunctive and other relief. The circuit court issued an ex parte injunction (i.e., TRO), on or about December 20, 1995, and it held an evidentiary hearing on January 2, 1996. On January 4, 1996, the court extended the ex parte injunction and it issued an interlocutory injunction on January 18, 1996. The January 18, 1996, injunction ordered that (1) pension benefits being paid under the A & E Plan not be reduced pursuant to County Bill No. 74–95, and (2) the provisions of Bill No. 74–95, which increased the age of retirement from 50 to 60 and decreased the benefit formula from 2.5% to 2% of final average earnings for each year of credited service (under 20 years), not go into effect. The provision of the bill reducing the minimum annual pension for certain individuals from $4,800 to $1,200, was specifically excluded from the scope of the injunction.

Contemporaneously, the plaintiffs moved for partial summary judgment. The County timely removed the case to this Court on January 19, 1996, based on federal question jurisdiction. Currently pending are the plaintiffs' motion for partial summary judgment; plaintiffs' motion for leave to amend their complaint; the County's motion for judgment on the pleadings; and the plaintiffs' second motion for partial summary judgment. A hearing on all outstanding motions was held on May 20, 1996.

## II. CLAIMS PRESENTED

The plaintiffs' complaint consists of four counts: a claim under the Anne Arundel County Code (count I); a claim under the

Contract Clause to the U.S. Constitution (count II); a claim "for violation of" 42 U.S.C. § 1983 (count III); and a claim for relief under the Maryland Uniform Declaratory Judgment Act (count IV).[1]

I am persuaded, in light of familiar summary judgment standards, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that plaintiffs are entitled to summary judgment on their claim that the County's retroactive divestment of their pension benefits violates the Contract Clause. I decline, however, to forecast that the Supreme Court will overrule one of its century-old precedents; I shall grant summary judgment in favor of the County as to the claim under 42 U.S.C. § 1983. Furthermore, all federal claims being thus adjudicated, I decline to go further to exercise supplemental jurisdiction over the non-federal claims. Accordingly, a declaratory judgment shall be entered as to the Contract Clause claim, and in the exercise of discretion appropriate to the circumstances of this case, the remaining state claims shall be remanded to state court for further proceedings, including amendment of the complaint.

## III. FACTS

### A. Background

Section 814 of the Anne Arundel County Charter provides for the establishment of pension benefits for all county employees "who are not covered by the State Retirement System. . . ." Accordingly, the County sponsors five pension plans, including the A & E Plan. Under the A & E Plan, the participant's benefits are calculated pursuant to a percentage of the participant's final average earnings multiplied by the participant's years of service. As the A & E Plan was ultimately amended, years of service are credited by either (1) performing work for the county; (2) transferring years of service earned at another specified benefit plan within the state of Maryland; or (3) purchasing years of service credit for service performed with certain other public employers, within or without the State of Maryland. The Plan is funded by both employer and employee contributions.

The plaintiffs are seeking injunctive and other relief from County Council Bill Nos. 61–94 and 74–95, which affect their pension benefits from the County. The plaintiffs argue that those bills are unconstitutional and otherwise invalid in that they purport to reduce retroactively the pension benefits of those individuals that are already retired and participating in the A & E Plan. The Plan was closed in 1994 to new members. There are currently fewer than 100 members in the A & E Plan.[2]

### B. Legislative Enhancements of Benefits Under the A & E Plan

On November 2, 1987, Anne Arundel County Council Bill No. 56–87 was enacted. The bill, *inter alia,* increased the A & E Plan participant's death benefit to a benefit equal to the participant's monthly pension benefit. The previous benefit had been a "cash refund" benefit in which the beneficiary (spouse or dependent child) received a refund of the participant's contributions less any retirement benefits already received.

On May 17, 1989, Anne Arundel County Council Bill No. 36–89 was enacted, amending Art. 7, § 3–207(a) of the Anne Arundel County Code to read as follows:

> Each appointed official who retires on or after the normal retirement date who has been credited with five years of service is entitled to receive, commencing on the first day of the month coinciding with or next following the date of retirement, an annual pension equal to the greater of:
>
> (1) $4,800; or

---

**1.** Plaintiffs have sought to amend the complaint. The proposed amendments would (1) recast and correct certain allegations of fact, (2) join an additional party-plaintiff, (3) add a prayer for monetary relief, and (4) add a fifth count pursuant to Art. XI–A, § 3 of the Maryland Constitution, relating to the advertisement of proposed County legislation. For the reasons discussed *infra,* the motion to amend shall be neither granted nor denied, but may be considered by the state court upon the remand.

**2.** The actual number is in dispute.

(2) 2½ of the final earnings for each year of credited service which is not in excess of 20 years, plus an additional 2% of final earnings for each year of credited service after 20 years; but the maximum pension may not exceed 70% of final earnings.

It also amended § 3–101(i) of the County Code, defining the "normal retirement age" as "the first day of the month after the earlier of a participant's 50th birthday or the date as of which a participant completes 16 years of service." The bill became effective on July 1, 1989, and applied only to those officials who retired from county employment subsequent to July 1, 1990. The asserted reason for these generous amendments to the A & E Plan was to provide an incentive for high level executive department appointees to remain in service during the "lame-duck" final term of the then County Executive. All the plaintiffs to this action are retired except plaintiff Ranking, who terminated her employment with the County (but did not retire) after approximately seven years of service.

C. Legislative Reductions in Benefits Sponsored by the New County Executive

In 1990, a new County Executive was elected. Not long after the new County Executive assumed office, and throughout the early 1990's, it became increasingly apparent to the County that the A & E Plan was seriously underfunded.[3] In response, several bills were enacted which prospectively eliminated or reduced some A & E Plan benefits.[4] In addition, in July 1994, County Council Bill No. 61–94 was enacted. Bill No. 61–94, effective September 1994, applied retroactively to all participants who had retired since December 19, 1987. It provided that the participant's surviving spouse was ineligible for death benefits unless the participant (1) had been at least 50 years old at retirement, (2) had at least 12 years of service, and (3) had been married to the surviving spouse for at least one year. In addition, the bill changed the death benefit payable to a surviving spouse and minor children to the greater of $120 or 50% of the retiree's accrued pension benefit.[5]

On November 15, 1994, County Council Bill No. 74–95 was enacted, effective, in part, on December 30, 1995, and, in part, on January 1, 1996. Bill No. 74–95 amended County Code §§ 3–101 and 3–207, retroactively repealing No. Bill 36–89. In effect, for persons in plaintiffs' status, it increased the retirement age to age 60, and it decreased the benefits formula from 2½% to 2%. Had the state court not issued its injunctions and allowed Bill No. 74–95 to go into effect as planned, the result would have been a substantial reduction in the current monthly payments to all of the retired plaintiffs.

## IV. ANALYSIS OF CONTRACT CLAUSE CLAIM

Article I, § 10, cl. 1 of the U.S. Constitution states: "No State shall ... pass any Law impairing the Obligation of Contracts...." This clause is commonly known

---

3. When it became underfunded, to what degree it was underfunded, and the causes of its underfunding are in dispute.

4. Bill No. 23–91 increased the normal retirement age to the earlier of age 60 or upon completion of 16 years of service. The bill applied only to those officials appointed or elected after December 1, 1990.

Bill No. 48–93 increased the normal retirement age to the earlier of age 60 or age 55 with completion of 30 years of service. It also eliminated the $4800 minimum benefit, and it reduced the benefit formula for appointed officials to 2% of the final average earnings for years of service not in excess of 10 years, plus an additional 2.5% for years in excess of 10. This bill applied only to those officials appointed or elect-

ed after June 30, 1993. Neither bill affects the plaintiffs.

5. The only plaintiff affected so far by Bill No. 61–94 is plaintiff Jonas. Jonas retired in 1991, but upon the adoption of Bill No. 61–94 in 1994, he reduced his benefits in order to preserve his spouse's entitlement to a survivor's benefit should he predecease her. Upon the remand of this case, it shall be open to the state court whether Jonas (and/or perhaps, whether his spouse) has effectively waived any claim by failing to challenge the application to him/her of Bill No. 61–94. Arguably, one might suppose, there must be some consequence arising from a voluntary decision not to fight. Seemingly, none of the other plaintiffs have standing to challenge Bill No. 61–94, but this issue need not be further explored.

as the Contract Clause. It has been held that the clause does not work an absolute prohibition on the rights of States to impair contractual obligations. Nonetheless, the State's right to do so is limited to proper exercises of its police power. The Supreme Court has set forth a framework for analyzing claims of state impairment with both public and private contracts.

In *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Court held that a New Jersey statute violated the Contract Clause by effecting a retroactive repeal of a 1962 covenant with New York and New Jersey Port Authority bondholders. The covenant limited the ability of the Port Authority to subsidize rail passenger transportation with revenues and reserves. According to the Court, less drastic means of achieving the State's goals were at its disposal.

In holding that the statute in question had created a contract, the Court explained that
[i]n general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State. Compare *Dodge v. Board of Education*, 302 U.S. 74, 78–79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937), with *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 104–105, 58 S.Ct. 443, 447–448, 82 L.Ed. 685 (1938). In addition, statutes governing the interpretation and enforcement of contracts may be regarded as forming part of the obligation of contracts made under their aegis.
*Id.* at 17 n. 14, 97 S.Ct. at 1515 n. 14. Moreover, the Court held that "[t]he obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement." *Id.* at 19 n. 17, 97 S.Ct. at 1516 n. 17 (collecting cases).

As with interference with private contracts, the Court determined that "the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *Id.* at 17, 97 S.Ct. at 1515. Nonetheless, "laws intended to regulate existing contractual relationships must serve a legitimate public purpose." *Id.* at 22, 97 S.Ct. at 1517 (citing *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444–45, 54 S.Ct. 231, 242–43, 78 L.Ed. 413 (1934)). Thus, the Court explained,
[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption. As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.
*Id.* at 22–23, 97 S.Ct. at 1518 (citations and footnote omitted). The Court held, however, that "[i]n applying this standard ... complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Id.* at 25–26, 97 S.Ct. at 1519. For example, "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors." *Id.* at 29, 97 S.Ct. at 1521.

The Court then set forth the yardsticks by which the necessity and reasonableness of the particular legislative enactment was to be measured. "The determination of necessity can be considered on two levels": (1) was this particular modification necessary or was a "less drastic modification" available to achieve the State's goals; and (2) was there a means to achieve the State's goals without altering the contractual terms at all. *Id.* at 29–30, 97 S.Ct. at 1521. "[A] State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Id.* at 31, 97 S.Ct. at 1522.

As for determining the reasonableness of the State's actions, the Court held that "[t]he extent of impairment is certainly a relevant factor. . . ." *Id.* at 27, 97 S.Ct. at 1520. More importantly, however, is a determination of whether the effects which the State intends to remedy by the modification "were

unforeseen and unintended by the legislature when [the statute was] originally adopted." *Id. See also id.* at 31 n. 30, 97 S.Ct. at 1522 n. 30 ("the elimination of unforeseen windfall benefits [are] a reasonable basis for sustaining changes").

The Court elaborated further the following year in *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). In *Spannaus,* the Court held that a 1974 Minnesota act violated the Contract Clause. The act imposed a "pension funding charge" on employers if certain conditions were met. The impact upon the particular employer's voluntary pension plan was substantial and severe. The act retroactively modified the compensation that the employer had agreed to pay its employees from 1963 to 1974 by changing the employer's obligations in the essential area of funding the plan (it required a 10–year vesting requirement). In addition, the act required the employer to make all the retroactive changes simultaneously. The Court also found no evidence of "an important general social problem" warranting the state's intrusion on the employers' contract rights.

The *Spannaus* Court explained that the Contract Clause, although a serious restraint on State power, is not to be read literally. *Id.* at 240–42, 98 S.Ct. at 2720–21. Most importantly, "it is to be accepted as commonplace that the Contract Clause does not operate to obliterate the police power of the States. ... '[T]he sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people ... is paramount to any rights under contracts between individuals.'" *Id.* at 241, 98 S.Ct. at 2721 (quoting *Manigault v. Springs,* 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905)). Nonetheless, the Court explained that the Contract Clause does restrain the power of the States, even as to their exercise of their "otherwise legitimate police power." *Id.* at 242, 98 S.Ct. at 2721.[6]

The *Spannaus* Court also reviewed the Court's earlier decision in *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). In *Blaisdell,* a Contract Clause challenge to a temporary mortgage moratorium enacted to provide relief for homeowners threatened with foreclosure was unsuccessful. *Id.* at 242, 98 S.Ct. at 2721. The *Spannaus* Court noted that the Court in *Blaisdell* found five factors determinative in its decision that the State's exercise of power was lawful:

(1) The act itself stated that its purpose was to meet emergency conditions;

(2) the act sought "to protect a basic societal interest, not a favored group";

(3) relief was narrowly tailored to meet emergency needs;

(4) "the imposed conditions were reasonable"; and

(5) "the legislation was limited to the duration of the emergency."

*Spannaus,* 438 U.S. at 242, 98 S.Ct. at 2721 (citing *Blaisdell,* 290 U.S. at 444–47, 54 S.Ct. at 242–43). *Accord Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410 n. 11, 103 S.Ct. 697, 704 n. 11, 74 L.Ed.2d 569 (1983).

After taking a survey of Contract Clause jurisprudence, the *Spannaus* Court identified the following fundamental principle in analyzing these types of cases: "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage." 438 U.S. at 245, 98 S.Ct. at 2722–23 (footnotes omitted).

In *Spannaus,* the impairment was severe. Of particular importance to the Court, and distinguishing that case from others where the legislation was upheld against Contract Clause challenges, was the fact that the act was seeking to aid a very narrow group of individuals on a permanent basis—i.e., the impairment did not arise from temporary legislation enacted to remedy broad emergency economic or social conditions. *Id.* at

**6.** Significantly, for present purposes, the Court, reviewing its opinion in *United States Trust Co., supra,* observed that "impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties...." 438 U.S. at 244 n. 15, 98 S.Ct. at 2722 n. 15.

248–50, 98 S.Ct. at 2724–25. *See, e.g., Blaisdell,* 290 U.S. 398, 54 S.Ct. 231 (temporary mortgage moratorium enacted to provide relief for homeowners threatened with foreclosure).

The Fourth Circuit considered a Contract Clause challenge in *Baltimore Teachers Union v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1015 (4th Cir.1993), *cert. denied,* 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994). There, the Court held that a city salary reduction plan adopted to meet immediate budgetary shortfalls did not violate the Contract Clause.

In undertaking its analysis, the Court summarized the three-part Contract Clause analysis which has emerged from Supreme Court jurisprudence, as follows:

> As a threshold matter, it must be determined whether there has been impairment of a contract. Second, it must be determined "whether the state law has, in fact, operated as a *substantial* impairment of a contractual relationship." *Spannaus,* 438 U.S. at 244, 98 S.Ct. at 2722 (emphasis added); *see also Bannum, Inc. v. Town of Ashland,* 922 F.2d 197, 202 (4th Cir.1990) (legislation must constitute "a severe impairment of the [contractual] right"). Finally, assuming there has been a substantial impairment of contract, it must be determined whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign powers, an inquiry that differs subtly depending upon whether the contract impaired is a private or, as here, a public one.

*Id.* at 1015 (citation omitted).

The Court determined that a contract existed and that the impairment had been substantial. *Id.* at 1015–18. In determining that the impairment was substantial, the Court observed that "[t]he Supreme Court . . . has provided little specific guidance as to what constitutes a 'substantial' contract impairment." *Id.* at 1017. Nonetheless, the Court explained that the Supreme Court has

"appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place, or where the impaired right was one on which there had been reasonable and especial reliance." *Id.* (citations omitted).[7]

In holding that the impairment was substantial, the Court explained that "[i]n the employment context, there likely is no right both more central to the contract's inducement and on the existence of which the parties more especially rely, than the right to compensation at the contractually specified level." *Id.* Significantly, the Court explained that although the diminution of salary was only .95% of an individual employee's annual salary, this still represented a substantial impairment because

> this amount could represent a substantial portion of a monthly mortgage or rental payment, or weeks of food. Indeed, because individuals plan their lives based upon their salaries, we would be reluctant to hold that any decrease in an annual salary beyond one that could fairly be termed *de minimis* could be considered insubstantial.

*Id.* n. 8 (collecting cases).

Both parties in *Baltimore Teachers Union* agreed that the financial integrity of Baltimore City was a "significant public purpose" to justify action on the part of the city, therefore, the only remaining question for the Court was whether the action taken was reasonable and necessary to achieve this purpose. *Id.* at 1019. As to the degree of deference to be accorded to the City in decisions involving public contracts, the Court explained that "[w]hile complete deference is inappropriate, . . . at least some deference to legislative policy decisions to modify these contracts in the public interest must be accorded." *Id.; see also id.* at 1019 n. 10 (observing that "[t]he [Supreme] Court has never expressly stated that any deference is owed legislative judgments in the context of

---

7. Thus, where the "particular rights were necessarily subject to legislative impairment" modification of the contract has withstood constitutional scrutiny. *Id.* at 1018. *See also Energy Reserves,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569; *Charleston v. Public Svc. Comm'n of W. Va.,* 57 F.3d 385, 394 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 474, 133 L.Ed.2d 404 (1995).

public contract impairment. However, the most reasonable inference ... is that *some* degree of deference is appropriate even where a state acts to impair its own contracts." (citations omitted)).

In explaining why it was reversing the district court's opinion striking down the legislation, the Court held:

It is not enough to reason, as did the district court, that "[t]he City *could have* shifted the burden from another governmental program," or that "it *could have* raised taxes." *Id.* (emphases added). Were these the proper criteria, no impairment of a governmental contract could ever survive constitutional scrutiny, for these courses are always open, no matter how unwise they may be. Our task is rather to ensure through the "necessity and reasonableness" inquiry that states neither "consider impairing the obligations of [their] own contracts on a par with other policy alternatives" or "impose a drastic impairment when an evident and more moderate course would serve its purposes equally well," *United States Trust*, 431 U.S. at 30–31, 97 S.Ct. at 1522, nor act unreasonably "in light of the surrounding circumstances," *id.* at 31, 97 S.Ct. at 1522.

*Id.* at 1019–20 (citation omitted) (alteration in the original).

In upholding the legislation, the Court observed that a real emergency existed, that the salary reductions were not the only (nor the first) means by which the City sought to meet its budgetary shortfall, the reduction was limited to meet the anticipated shortfall (and was discontinued when it realized that the shortfall was not as great as it anticipated), the plan was less drastic than other alternatives (e.g., layoffs), the plan dealt with a general societal problem, the plan applied equally to all City employees, as public employees it should not have been unexpected that they would be called upon to make a sacrifice under such circumstances, and the plan was limited in duration.[8] *Id.* at 1020–21.

Finally, the Court explained its role in relation to the local legislature in determining the public policy questions presented by cases like this one as follows:

The authority of the states to impair contracts, to be sure, must be constrained in some meaningful way. The Contract Clause, however, does not require the courts—even where public contracts have been impaired—to sit as superlegislatures, determining, for example, whether it would have been more appropriate instead for Baltimore to close its schools for a week, an option actually considered but rejected, or to reduce funding to the arts, as appellees argue should have been done. Not only are we ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives; we have no objective standards against which to assess the merit of the multitude of alternatives.

*Id.* at 1021–22.

Most recently, Judge Motz, writing for the Fourth Circuit in *Charleston v. Public Svc. Comm'n of W.Va.*, 57 F.3d 385 (4th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 474, 133 L.Ed.2d 404 (1995), explained in detail the analysis required in determining if the contractual impairment alleged is substantial. Judge Motz explained that in determining whether the alleged impairment is substantial, the

greatest concern appears to be the contracting parties' actual reliance on the abridged contractual term. Specifically, the Supreme Court has examined contracts to determine whether the abridged right is one that was "reasonably relied" on by the complaining party, *Spannaus*, 438 U.S. at 246, 98 S.Ct. at 2723, or one that "substantially induced" that party "to enter into the contract." *City of El Paso v. Simmons*, 379 U.S. 497, 514, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965); *see also United States Trust*, 431 U.S. at 19 n. 17, 97 S.Ct. at 1516 n. 17. *See generally Baltimore Teachers Union*, 6 F.3d at 1017–18 and n. 7. When assessing whether there has been the requisite reliance, the Court has looked to objective evidence of reliance.

F.3d at 1021.

---

8. In fact, the City's plan was "immediately discontinued ... at the first opportunity...." 6

*Id.* at 392. Whether there has been "actual reliance" by the party alleging impairment has been determined by a consideration of the following objective factors:

(1) "[W]hether the contract—either explicitly or implicitly—indicated that the abridged term was subject to impairment by the legislature." *Id.* at 392–93.

(2) Whether the right involved has been subject to regulation in the past. *Id.* at 393. Existence of past pervasive regulation is some indication that the complaining party had no reasonable basis upon which to rely on the provision. *Id.*

(3) The extent of the modification. *Id.* An absolute abolishment of the covenant would more clearly upset a party's legitimate expectations than would a modest modification. *Id.*

(4) Whether the right abridged was essential in nature to the underlying contract. Modifications effecting a "fundamental change" in a "primary consideration" of the parties is more likely to have worked a substantial impairment. *Id.* at 393–94.

The Court held that

each of these factors indicate that the 1990 amendment did not constitute a substantial impairment of the bond contracts. The bond contracts themselves contain express acknowledgements that the parties' rights were subject to legislative regulation; there was a long established precedent of extensive state regulation of public utilities; the contracts were not abolished but merely modified; and the abridged right is, by its nature, not one central to the parties' undertaking.

*Id.* at 394.[9]

## V. APPLICATION OF LAW TO THIS CASE

Plaintiffs argue that Bill Nos. 61–94 and 74–95 effect a substantial impairment of their contract rights in violation of the Contract Clause. In particular, the plaintiffs suggest that they relied upon the increase in benefits in making their decision to stay at their positions and in altering their retirement plans in respect to spousal and dependent survivor benefits. The County responds, in the alternative, (1) that there is no enforceable contract, thus there can be no violation, and (2) that the impairment is justified, reasonable and necessary.

### A. Existence of a Contract

■ First, the County contends that there is no enforceable contract because county officials involved in helping to get the benefit-enhancing original legislation passed (who were themselves beneficiaries of the changes) supplied the County Council with incorrect information and knowingly concealed other significant information. Thus, as no *private* enforceable contract could be formed under Maryland law under similar circumstances, the County argues that Bill Nos. 56–87 and 36–89 cannot constitute an enforceable "contract."

■ In determining whether legislation creates a contract for purposes of Contract Clause analysis, the law of the state in which the legislation was enacted is determinative. *Kestler v. Board of Trustees of No. Carolina Gov'tal Employees' Retirement Sys.*, 48 F.3d 800, 803 (4th Cir.) (citing *Baker v. Baltimore County, Maryland*, 487 F.Supp. 461, 466–67 (D.Md.1980), *aff'd*, 660 F.2d 488 (4th Cir. 1981)), *cert. denied*, —— U.S. ——, 116 S.Ct. 186, 133 L.Ed.2d 124 (1995). In this case, that state is Maryland. It is clear that

[u]nder Maryland law, pension plans create contractual duties toward persons with vested rights under the plans. *See, e.g., Archer v. Archer*, 303 Md. 347, 357, 493 A.2d 1074 (1985); *Lookingbill v. Lookingbill*, 301 Md. 283, 289, 483 A.2d 1 (1984); *Deering v. Deering*, 292 Md. 115, 124–128, 437 A.2d 883 (1981); *City of Frederick v. Quinn*, 35 Md.App. 626, 371 A.2d 724 (1977).

*Board of Trustees of the Employees' Retirement Sys. v. Mayor & City Council of Baltimore City*, 317 Md. 72, 99, 562 A.2d 720, 733 (1989), *cert. denied sub nom., Lubman v. Mayor and City Council of Baltimore City,*

---

9. The Court also relied on the fact that the security provision in question was "'replaced by an arguably comparable security provision.'" 57 F.3d at 394 (quoting *United States Trust*, 431 U.S. at 19, 97 S.Ct. at 1516).

493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). *See also Davis v. Mayor and Alderman of the City of Annapolis,* 98 Md. App. 707, 715, 635 A.2d 36, 40 (1994).

 I conclude that the County's recitation of contract principles which might ordinarily invalidate a contract in Maryland are inappropriate in the case of a public employee pension plan created by legislative enactment. Regardless of whether in the private contract setting an enforceable contract would have been formed, a statute or ordinance remains a statute or ordinance irrespective of common law contract principles. The County, conceding that its theory is novel, to say the least, has pointed to no authority to the contrary. Thus, the question for the Court is not whether a valid contract was created in terms of a private contractual relationship, but rather, whether a valid legislative enactment exists. Bill Nos. 56–87 and 36–89 are not actually contracts but, rather, they are "treated as a contract" for purposes of Contract Clause analysis. *See United States Trust,* 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14. The County's argument that the "Contract Clause does not protect expectations that are based upon contracts that are invalid, illegal, [or] unenforceable," Df.'s Mem. of Grds and Auth. in Opp. to Pls' Mot. for Part.Summ.J. at 26 ("Df.'s Mem."), is undoubtedly true, but quite beside the point under existing law. The County fails to demonstrate how Bill Nos. 56–87 and 36–89 were invalid, illegal, or constituted void legislation. Thus, I reject the County's novel theory that the pension plan does not constitute an enforceable contract.

### B. Substantial Impairment

 There is no dispute that the bills in question work an impairment of the plaintiffs' contract rights. Furthermore, there can be little doubt that the impairment is substantial. The reliance which the aggrieved party placed on the contractual obligation appears to be the primary yardstick by which the degree of impairment is determined. *See Baltimore Teachers Union,* 6 F.3d at 1018. In *Baltimore Teachers Union v. Mayor and City Council of Baltimore,* the Fourth Circuit held that "[i]n the employment context, there likely is no right both more central to the contract's inducement and on the existence of which the parties more especially rely, than the right to compensation at the contractually specified level." *Id.* Although that case dealt with the diminution of an employee's annual salary, its holding is equally applicable here where "individuals plan their lives based upon their [pension benefits]. . . ." *Id.* at 1018 n. 8. The diminution of pension benefits is more likely than not an even *more* substantial impairment than a diminution of annual salary because the individual receiving pension benefits is typically already living on a reduced income as compared to her pre-retirement earnings. Thus, a decrease in benefits would potentially have a greater impact.

 The County suggests that the impairment would be substantial only if the plaintiffs' "legitimate expectations" for benefits were not met. This is really a restatement of its "no enforceable contract" argument. As support for its position that the plaintiffs did not have "legitimate expectations" to receive the benefits to which they were lawfully entitled at the time of their retirements, the County states that (1) only one of the plaintiffs joined the plan after the 1987 and 1989 changes, and (2) because the benefit-enhancements mandated by the 1987 and 1989 changes exceed the typical benefits under comparable plans, the plaintiffs' expectations were not "legitimate." Df.'s Mem. at 32–33. Neither argument is persuasive.

First, the timing of the plaintiffs' entry into the A & E Plan is immaterial. The fact remains that they were free to leave their positions at will, but each remained on the job for more than a year (as required under law) to "earn" the enhanced benefits. Consequently, the existence of benefits which came into being after they began working was as much an inducement to stay on as it would have been for them to take the positions in the first place. Second, what other individuals in other pension plans might be entitled to receive, comparable or otherwise, is irrelevant to the constitutional issue presented. The question is what the plaintiffs expected to receive under their plan, not

whether they would have been entitled to those benefits if they had worked somewhere else, or had come to work for the County at a later time.[10]

### C. Reasonableness and Necessity

▮▮ Even a substantial "impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *United States Trust*, 431 U.S. at 25, 97 S.Ct. at 1519. The County suggests that its "important public purpose" in enacting Bill Nos. 61–94 and 74–95

> was not [to] remedy[ ] an acute financial crisis faced by the Anne Arundel County government, but instead was the restoration of the actuarial soundness of the A & E Plan and the elimination of pension benefits which were the product of self-dealing, deception, and outright misrepresentation of the costs. Clearly, it is inconsistent with the sovereign power of the State, as exercised by one of its political subdivisions, to be rendered helpless to undo such a wrong.

Df.'s Mem. at 34.

Although I have no doubt that maintaining the "actuarial soundness" of the A & E Plan is an important purpose, *see, e.g., Maryland State Teachers Assoc., Inc. v. Hughes*, 594 F.Supp. 1353, 1364–68 (D.Md.1984), the County has failed to make a sufficient showing that the means which it has adopted to address its "problem" is the least drastic available.[11] *United States Trust*, 431 U.S. at 31, 97 S.Ct. at 1522. Nor has there been a showing that the conditions imposed by Bill Nos. 61–94 and 74–95 are reasonable or narrowly tailored to achieve the purpose at hand. *Energy Reserves Grp., Inc.*, 459 U.S. at 410 n. 11, 103 S.Ct. at 704 n. 11; *Spannaus*, 438 U.S. at 242, 98 S.Ct. at 2721 (citing *Blaisdell*, 290 U.S. at 444–47, 54 S.Ct. at 242–

43). Furthermore, it has been held that, in Maryland, "under certain circumstances the government may unilaterally modify [pension benefits] so long as the changes do not adversely alter the benefits, or if the benefits are adversely altered, they are replaced with comparable benefits." *Davis*, 98 Md.App. at 715, 635 A.2d 36. *See also Hughes*, 594 F.Supp. at 1363. *Cf. Charleston*, 57 F.3d at 394 (altered security provision was "'replaced by an arguably comparable security provision'") (quoting *United States Trust*, 431 U.S. at 19, 97 S.Ct. at 1516). There has been no showing that the benefits which the County took away have been replaced with comparable benefits.[12]

▮▮ Moreover, the County readily acknowledges that this is not an emergency situation. Although an emergency is not necessary to justify an impairment, *Baltimore Teachers Union*, 6 F.3d at 1020 n. 11, courts have typically upheld such extreme modifications only in the face of emergency or temporary situations. *See Spannaus*, 438 U.S. at 248–50, 98 S.Ct. at 2724–25; *Blaisdell*, 290 U.S. 398, 54 S.Ct. 231; *Baltimore Teachers Union*, 6 F.3d at 1020–21.

### VI. SUMMARY OF CONTRACT CLAUSE ANALYSIS

▮▮ Although the argument could be made that the County Council did pursue other means of achieving its goal as well, i.e., through its earlier prospective legislation, when faced with as substantial an impairment as proposed here, I cannot conclude that it has gone far enough to pursue other alternatives or to demonstrate that those alternatives were not as worthwhile or feasible. "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Spannaus*, 438 U.S. at 245, 98

---

**10.** Perhaps under some imaginable circumstances, the benefits promised could have been so outlandish that no reasonable person could have expected to have received them. Nonetheless, although the A & E Plan as amended was extraordinarily generous, essentially treating desk-bound bureaucrats like law enforcement officers and firefighters, I do not believe that the level of benefits involved in this case approaches the "outlandish."

**11.** In fact, the plaintiffs suggest several alternative remedies to the County's conundrum, *see* Pls' Mem or Points and Auth. in Supp. of Verified Mot. for Ex Parte and Interlocutory Inj. at 44–47, none of which the County addresses.

**12.** As I expressed at the hearing, moreover, if punishment of official misconduct is the County's aim, criminal and civil remedies remain available for invocation against identified malefactors.

S.Ct. at 2722–23. Here, I am persuaded that the hurdle is very high. Accordingly, I conclude as a matter of law that the Contract Clause has been violated, and I shall grant the plaintiffs' motion for partial summary judgment.

## VII. THE SECTION 1983 CLAIM

In addition to the assertion of the Contract Clause claim (essentially under 28 U.S.C. § 1331 for purposes of this Court's removal jurisdiction), plaintiffs have sought to assert a claim under 42 U.S.C. § 1983, admittedly, in commendable candor, solely to provide a basis for seeking their attorneys' fees and costs under 42 U.S.C. § 1988.[13] I decline, however, for the reasons stated at the hearing, and despite the cogency of plaintiffs' arguments to the contrary, to rule on the basis of a forecast that the Supreme Court will at its first opportunity expressly overrule *Carter v. Greenhow,* 114 U.S. 317, 322, 5 S.Ct. 928, 930–31, 29 L.Ed. 202, 204 (1885) (no § 1983 claim lies for a Contract Clause violation).[14] Accordingly, judgment shall be entered in favor of the County on this issue.

13. Although the complaint is unartfully pled as asserting a claim "for violation of" § 1983, plaintiffs have clarified that they intended to assert a claim *under and pursuant to* § 1983 for the underlying Contract Clause violation. Still, plaintiffs have not clarified whether their claims for damages, as contrasted with their claims for declaratory and injunctive relief, are intended to be asserted under § 1983 or under state law. Although the damage issues may be adjudicated upon the remand of this case to state court, *see* text *infra* and n. 14, for the reasons set forth in this section of this opinion, plaintiffs may not seek damages under § 1983.

14. In *Carter*, the Supreme Court determined that, in fact, only one remedy was available under the Contract Clause:

That constitutional provision, so far as it can be said to confer upon or secure to any person any individual rights, does so only indirectly and incidentally. It forbids the passage by the states of laws such as are described. If any such are, nevertheless, passed by the legislatures of a state, they are unconstitutional and void. In any judicial proceeding necessary to vindicate his rights under a contract affected by such legislation, the individual has a right to have a judicial determination declaring the

## VIII. REMAND

In light of my early and final determination of each of the asserted federal claims in this case, the only remaining claims are state law claims. Remand of removed cases under such circumstances is the general rule. *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir.1995); *see also Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) ("[The Court's opinion in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966),] strongly supports the conclusion that when a district court may relinquish jurisdiction over a removed case involving pendent state claims, the court has discretion to remand the case to state court."); 28 U.S.C. § 1367(c)(3). "[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan,* 58 F.3d at 110. Moreover, "[t]here are no situations wherein a federal court *must* retain jurisdiction over a state law claim, which would not by itself support jurisdiction." *Id.*

In determining whether to retain or to remand the instant case to state court, this

nullity of the attempt to impair its obligation. This is the *only right* secured to him by that clause of the constitution.

114 U.S. at 322, 5 S.Ct. at 930–31 (emphasis added). *See also Ex parte Ayers,* 123 U.S. 443, 504, 8 S.Ct. 164, 182, 31 L.Ed. 216 (1887) (quoting *Carter* with approval).

Damages are available, however, for a breach of contract. "The Supreme Court in the context of the contract clause has drawn a distinction between a breach of a contract and impairment of the obligation of the contract." *E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page County, Illinois,* 613 F.2d 675, 679 (7th Cir.1980) (citing *Hays v. Port of Seattle,* 251 U.S. 233, 237, 40 S.Ct. 125, 126–27, 64 L.Ed. 243 (1920)). Thus, in the instant case, if the County were now unwilling to pay the plaintiffs their pension benefits according to the terms of Bill Nos. 56–87 and 36–89, the plaintiffs would have a state law cause of action for damages for breach of contract. *Id.* at 680. *See also Horwitz–Matthews, Inc. v. City of Chicago,* 78 F.3d 1248 (7th Cir.1996) (Posner, C.J.) (explaining the difference between legislation which "leaves the promisee with a remedy in damages for breach of contract and one that extinguishes the remedy"; only the latter involves the Contract Clause); *Jackson Sawmill Co. v. United States,* 580 F.2d 302, 311–12 (8th Cir. 1978) (same).

Court must consider a variety of equitable factors, including: "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* *See also Carnegie–Mellon,* 484 U.S. at 350 & n. 7, 108 S.Ct. at 619 & n. 7; *In re Conklin,* 946 F.2d 306, 322 (4th Cir.1991). Moreover, this Court should consider the "amount of time and energy that has already been expended, and decide whether it might be more efficient to simply retain jurisdiction." *Shanaghan,* 58 F.3d at 112. See also *Washington v. Union Carbide Corp.,* 870 F.2d 957, 962 (4th Cir.1989).

▆ In weighing these various factors, this Court finds that remand is the proper course of action. First, very little, if any, additional legal research will be required of the parties. Second, any additional factual development which the parties must now engage in would have had to have been performed regardless of the forum. Thus, it does not appear that remanding this case to the Circuit Court for Anne Arundel County, Maryland, would be unduly inconvenient or unfair. *See Parker & Parsley Petro. Co. v. Dresser Ind.,* 972 F.2d 580, 587–88 (5th Cir. 1992). In addition, judicial economy will be served by remand to the state court, because the issues in this case

> have been developed and narrowed in federal court, and, as a result, they will be in a posture to be readily resolved in state

court.... [J]udicial economy would not be served by allowing ... [the] state claims [to be retained by the] federal court on the strength of [finally resolved] federal claim[s].

*McCullough v. Branch Banking & Trust Co.,* 844 F.Supp. 258, 262 (E.D.N.C.1993), *aff'd,* 35 F.3d 127 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1101, 130 L.Ed.2d 1069 (1995).

At the hearing in this case, it was disclosed that the eleventh hour removal of this case was reluctantly effected by the County for reasons which probably now no longer obtain. Furthermore, the proposed amended complaint seeks to assert a novel state constitutional claim better suited for resolution in state court. *See Green v. Zendrian,* 916 F.Supp. 493 (D.Md.1996) (declining to exercise supplemental jurisdiction over claim under Maryland Constitution). Moreover, the plaintiff seeking to join the action in the amended complaint relies on state law issues intimately related to his divorce, which was granted by the Circuit Court for Anne Arundel County, the very court to which this case shall be remanded. All of these factors militate strongly in favor of remand.

Accordingly, this case shall be remanded to the Circuit Court for Anne Arundel County, Maryland, for resolution of all remaining issues.[15]

**15.** I note, however, that should neither party choose to appeal my order to the United States Court of Appeals for the Fourth Circuit, a remand gives the County a second bite at the apple, because the circuit court will not be bound by my analysis. The Maryland Court of Appeals recently explained in *Gertz v. Anne Arundel County:*

> Maryland Rule 2–602(a) makes clear that an order that does not adjudicate all of the claims in an action, or that adjudicates less than an entire claim, or that adjudicates the liabilities of fewer than all the parties to the action is not a final judgment and may be revised at any time before the entry of a final judgment. See *Rohrbeck v. Rohrbeck,* 318 Md. 28, 44, 566 A.2d 767, 775 (1989) (until there is a final judgment, under Maryland Rule 2–602, all prior rulings remain interlocutory and subject to revision). We have held, moreover, that "as a general principle, one judge of a trial court ruling on a matter is not bound by the prior

ruling in the same case by another judge of the court; the second judge, in his discretion, may ordinarily consider the matter de novo." *State v. Frazier,* 298 Md. 422, 449, 470 A.2d 1269, 1283 (1984).

339 Md. 261, 272–73, 661 A.2d 1157, 1163, *cert. denied,* —— U.S. ——, 116 S.Ct. 522, 133 L.Ed.2d 429 (1995). *See also Stewart v. State,* 319 Md. 81, 91, 570 A.2d 1229, 1233 (1990) ("[N]o trial judge is required to abdicate his own individual judgment merely because a colleague of coordinate jurisdiction has made a ruling."). *Cf. Resolution Trust Corp. v. Allen,* 16 F.3d 568, 573 (4th Cir.1994) ("[A]fter removal [of a case from state court to federal district court,] the district court would adopt the state court judgment as its own.... [Then] the parties would follow the ordinary rules regarding post-judgment remedies. They may file motions pursuant to the applicable Rules of Civil Procedure, or file a timely notice of appeal to the federal appeals court.").

## AMENDED JUDGMENT ORDER

For the reasons set forth in the foregoing **Memorandum Opinion,** it is this 31st day of May 1996, by the United States District Court for the District of Maryland OR-DERED, DECREED AND ADJUDGED:

(1) The plaintiffs' motion for partial summary judgment BE, and IT HEREBY IS, GRANTED;

(2) Anne Arundel County Bill No. 74–95, as applied to plaintiffs in this action, is violative of the Constitution of the United States, Article I, § 10, cl. 1, in that it works an impermissible impairment of plaintiffs' contractual entitlement to pension benefits, and same shall not be applied or enforced against plaintiffs to this action;.

(3) The defendant's motion for judgment on the pleadings, as to any claim under 42 U.S.C. § 1983, BE, and IT HEREBY IS, GRANTED, and JUDGMENT IS HEREBY ENTERED AS TO ANY SUCH CLAIM IN FAVOR OF DEFENDANT, without prejudice to any other claim or right now or hereafter asserted by plaintiffs for money damages or otherwise;

(4) All remaining claims in this case, now or hereafter asserted, BE, and THEY HEREBY ARE, REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY;

(5) The Clerk shall CLOSE this case;

(6) The Clerk shall mail copies of this **Judgment Order** and the foregoing **Memorandum Opinion** to counsel of record.